# DES MOINES GAS COMPANY *v.* CITY OF DES MOINES.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF IOWA.

No. 75.  Argued November 10, 11, 1914.—Decided June 14, 1915.

The public authority is presumed to have acted fairly, and the burden of proof is on a public utility corporation to show that a regulating ordinance has the effect to deprive it of an income equivalent to a fair return upon its property dedicated to public use. *Knoxville* v. *Water Co.*, 212 U. S. 1.

Good will, in the sense generally used as indicating that element of value which inheres in the fixed and favorable consideration of customers arising from an established and well known and well conducted business, has no place in the fixing of valuation for the purpose of rate making of public service corporations. *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19.

There is, in some cases, a "going concern value" which is an element to be considered in determining valuation on which the owner is entitled to a fair return although the property is dedicated to a public use; there is no fixed rule for ascertaining this but each case must be controlled by its own circumstances.

Where, as in this case, the Master after exhaustive testimony certifies the value of a long established and successful public service plant, for rate making purposes, upon the basis of a plant in successful operation and overhead charges have been allowed, the court will presume that the element of going concern value has been considered and included in the total value certified.

The court will not regard the refusal of the lower court to enjoin a rate making ordinance as confiscatory upon the conclusion that it allowed a return of six per cent per annum, on the valuation of the plant, although the Master expressed the opinion that the corporation ought to earn eight per cent, where, as in this case, the ordinance was attacked before opportunity to test its results by actual experience.

Ordinarily, time alone can satisfactorily demonstrate whether a rate fixed by ordinance is or is not confiscatory so as to amount to a taking of property without due process of law within the meaning of the

Fourteenth Amendment, and in this case there should be an actual application of the rates.

Following the rule laid down in *Knoxville* v. *Water Co.*, 212 U. S. 1, and *Willcox* v. *Gas Co.*, 212 U. S. 19, the bill seeking to enjoin the putting of the ordinance involved in this case into effect should be dismissed without prejudice to the right of complainant to reinstate the case after a reasonable period for an actual demonstration of the effect of the ordinance.

199 Fed. Rep. 204, modified and affirmed.

THE facts, which involve the validity under the impairment of obligation provision of, and the due process clause of the Fourteenth Amendment to, the Federal Constitution of an ordinance of the City of Des Moines fixing ninety cents as the price of gas in that city, are stated in the opinion.

*Mr. Nathaniel T. Guernsey*, with whom *Mr. George H. Carr* was on the brief, for appellant:

At the time in question the City of Des Moines had the power to establish reasonable rates to be charged by appellant for gas sold and distributed in the city. Code of Iowa, 1897, Supp., §§ 724, 725.

Rates so established must be sufficient to afford to the appellant a fair return upon the value of its property, *i. e.*, a return relatively equal to what money devoted to other like investments will earn. *Minnesota Rate Cases*, 230 U. S. 352, 434; *Smyth* v. *Ames*, 171 U. S. 361; *San Diego Land Co.* v. *National City*, 174 U. S. 739; *San Diego Land Co.* v. *Jasper*, 189 U. S. 439; *Stanislaus County* v. *San Joaquin Co.*, 192 U. S. 201; *Knoxville* v. *Water Co.*, 212 U. S. 1; *Willcox* v. *Gas Co.*, 212 U. S. 19.

The value to be ascertained is the fair value of the property used in performing the public service.

Appellant was bound to establish each ultimate fact necessary to sustain a decree in its favor by clear and satisfactory evidence, but not beyond reasonable doubt.

Depreciated cost of reproduction should not have been deducted. *Willcox* v. *Gas Co.*, 212 U. S. 19; *S. C.*, below,

157 Fed. Rep. 849; *Omaha* v. *Water Co.*, 218 U. S. 180; *Steenerson* v. *Great Northern Ry.*, 69 Minnesota, 353; *State* v. *Minn. & St. L. R. R.*, 80 Minnesota, 191; *Cotting* v. *Kansas City Stock Yards*, 82 Fed. Rep. 850, 854; *Kings County Lighting Co.* v. *Willcox*, 156 App. Div. (N. Y.) 603.

*Cedar Rapids Gas Co.* v. *Cedar Rapids*, 144 Iowa, 426, does not hold the contrary.

. The court erred in its conclusion that the total of $2,240,928 was stated by the master as the value of the plant, and in the conclusion that this included the item of $300,000 on account of going value.

The item of going value is an element contributing to the value of each tangible part. *Omaha* v. *Water Co.*, 218 U. S. 180.

The *Cedar Rapids Case, supra,* did not hold that this item should be disallowed.

Going value is an element in the value of such a property. *National Water Works* v. *Kansas City*, 62 Fed. Rep. 853; *Omaha* v. *Water Co.*, 218 U. S. 180; *Public Service Gas Co.* v. *Utility Commissioners*, 87 Atl. Rep. 651; *Kings County Lighting Co.* v. *Willcox*, 156 App. Div. (N. Y.) 603; *Monongahela Water Case*, 223 Pa. St. 323; *Appleton Water Works* v. *Wisconsin*, 142 N. W. Rep. 476; *Gloucester Water Co.* v. *Gloucester*, 179 Massachusetts, 365; *Norwich Gas Co.* v. *Norwich*, 76 Connecticut, 565; *Spring Valley Water Works* v. *San Francisco*, 124 Fed. Rep. 574; *S. C.*, 165 Fed. Rep. 657; and 192 Fed. Rep. 137; *Kennebec Water District* v. *Waterville*, 97 Maine, 185; *Water Co.* v. *Galena*, 74 Kansas, 644; *Bristol* v. *Water Works*, 23 R. I. 274; *Water Co.* v. *Newburyport*, 168 Massachusetts, 541; *Venner* v. *Urbana Water Co.*, 174 Fed. Rep. 348; *Bonbright* v. *Geary*, 210 Fed. Rep. 44.

The rule is the same in rate cases and condemnation cases. *Omaha* v. *Water Co.*, 218 U. S. 203.

The word "property" describing what is protected in condemnation cases involving the Fifth Amendment, and

in confiscation cases involving the Fourteenth Amendment, means the same thing in each Amendment. *Willcox* v. *Gas Co.*, 212 U. S. 19; *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312; *Fairbanks* v. *United States*, 181 U. S. 283; *Minnesota Rate Cases*, 230 U. S. 352.

As to what is a fair return and for the distinction between a reasonable rate and a fair return, see *Public Service Gas Co.* v. *Utility Commissioners*, 87 Atl. Rep. 651.

It will vary under varying conditions. *Willcox* v. *Gas Co.*, 212 U. S. 19, 48.

What it is, is a question of fact, to be determined by the testimony in each case. *Gas Light Co.* v. *Cedar Rapids*, 144 Iowa, 426, 448.

Under the rule in the *Consolidated Gas Case*, 8% was justified by the evidence in this case. A public utility must constantly increase its investment and must pay for the new money required whatever such money is worth in the market.

Upon the facts found, the complainant was entitled to a decree in its favor.

In making his estimates, the master took into account normal increase in its sales, while the history of the plant demonstrates that increases in sales in amounts sufficient to earn a fair return would have been impossible.

To sell gas there must be persons to buy it.

The population was insufficient to afford a market for the gas necessary to earn a fair return.

The plant had not the capacity to manufacture enough gas to afford a fair return.

A large additional investment would have been required, increasing the amount upon which the return must be earned

Computations predicated upon the facts found by the Master demonstrate that upon no reasonable hypothesis could a fair return be anticipated.

The clear and satisfactory evidence rule simply requires

that where facts have been established by testimony of this character, the rule may not be invoked to discredit · sound and legitimate inferences from them. These facts may be established without evidence deduced from a trial of the rates. *Willcox* v. *Gas Co.*, 212 U. S. 19; *Gas Co.* v. *Lincoln*, 223 U. S. 349.

The court erred in dismissing the bill upon the merits and then in attempting to provide for a reopening of the case after three years. *Bronson* v. *Schulten*, 104 U. S. 410.

So far. as the appellant is concerned if it is not entitled to a decree in its favor upon the merits, it is entitled to an opportunity to try the rates and to definitely establish the facts upon which the rights of the parties depend. *Stanislaus County* v. *San Joaquin*, 192 U. S. 201; *Knoxville* v. *Water Co.*, 212 U. S. 1; *Willcox* v. *Gas Co.*, 212 U. S. 19; *Gas Co.* v. *Cedar Rapids*, 223 U. S. 655; *Minnesota Rate Cases*, 230 U. S. 352; *Missouri Rate Cases*, 230 U. S. 474; *In re Louisville*, 231 U. S. 639; *Louisville* v. *Cumberland Tel. Co.*, 231 U. S. 652; *Nor. Pac. Ry.* v. *North Dakota*, 216 U. S. 579.

*Mr. H. W. Byers*, with whom *Mr. R. O. Brennan* and *Mr. Eskil C. Carlson* were on the brief, for appellee.

MR. JUSTICE DAY delivered the opinion of the court.

This suit was begun in the District Court of the United States for the Southern District of Iowa, by the present appellant, hereinafter called the Gas Company, against the City of Des Moines and others, to enjoin the enforcement of the provisions of a certain ordinance of the City, passed December 27, 1910, whereby, from and after the first day of January, 1911, the rate to be charged and collected for gas in the City of Des Moines was fixed at ninety cents for each thousand cubic feet. The allegations of the bill were that to enforce the ordinance would amount

to the taking of the Gas Company's property without
just compensation and operate as confiscation of its prop-
erty, and thereby deprive it of the same without due
process of law, and would deny the equal protection of
the laws; further, that it would impair the existing con-
tract between the Gas Company and the City, and be-
tween the Gas Company and the State of Iowa, growing
out of its incorporation under the statutes of the State
and of the ordinances of the City, giving rights to the
Gas Company to lay its mains and supply gas to the resi-
dents of the City. A temporary injunction was allowed,
and after issue made, the case was referred to Robert
Sloan, Esquire, as Special Master in chancery to report
his findings of fact and conclusions of law. The Master
afterwards filed his report, and the same coming on before
the District Court for hearing, upon exceptions, the report
of the Master was confirmed, and the bill dismissed "with
prejudice" (199 Fed. Rep. 204). From that decree the
present appeal is taken.

The Master's report, as court and counsel agree, gives
evidence of a very thorough consideration of the subject,
and the facts found are accepted by the appellant. From
the report we learn that the plant belonging to the Gas
Company dates back to the year 1864; that it was owned
and operated by the Capital City Gas Light Company until
March 1st, 1906, when the present company was organized
and the property, real and personal, of the Capital City
Company conveyed to it; that The United Gas Improve-
ment Company, of Philadelphia, became the owner of the
entire stock of the Capital City Company on June 1st,
1886; that the capital stock then consisted of 3,000 shares
of the par value of one hundred dollars each, and that
subsequently the capital stock was increased to 6,000
shares of the same value each; that the growth of the City
of Des Moines increased the demand for gas, and many
extensions were added. In making these improvements

and extensions, the Capital City Gas Light Company became indebted to The United Gas Improvement Company for cash advanced, and otherwise, to the amount of $105,526.49, and also for gas holder $103,958 and the United Gas Improvement Company also owned $400,000 of bonds secured by mortgage on the plant of the Capital City Company. On March 1st, 1906, the Capital City Company transferred and conveyed its property to the present Gas Company, the authorized capital stock of the new company being 22,500 shares of the par value of $100 each. At the time of this transfer, the new company executed to The United Gas Improvement Company $800,000 stock contracts bearing 6 per cent. interest until paid, and also authorized and executed to the Commercial Trust Company, of Philadelphia, Pa., a deed of trust to all property of the Des Moines Gas Company, transferred to it as aforesaid to secure the payment of $1,500,000 5 per cent. gold bonds payable semi-annually, which were to be issued as provided by said mortgage. The sum of $240,000 bonds were issued at the date of execution of the mortgage, one-half thereof used in payment of the debt due The United Gas Improvement Company for the gas holder, and the other half to pay the amount due on account to that company. On January 1st, 1907, there were also issued $400,000 of these bonds to pay the bonds then due of the Capital City Company. When the transfer was made $45,000 was issued to pay for the Valley Junction property. This is a town adjacent to Des Moines, and something like six miles from the gas works of the Gas Company, to which the gas is transmitted by high pressure mains through the city, by a distribution system therein. There is nothing in the record to show the value of the Valley Junction property, except that of a high pressure main, which is also used in distributing gas in the city. Extensions and improvements have been made to the works and distribution system since the date of

transfer up to the first day of January, 1911, to the amount of $412,704.51, and, as provided by the mortgage, bonds have been issued by the trustee to the amount of $1,097,000, and these bonds have all been purchased by The United Gas Improvement Company. The total discount on these bonds is $33,950; $267,000 discounted at 10 per cent. and the balance, $145,000, at 5 per cent. No dividends have been declared by the present company upon its stock, but the interest upon the stock contracts and bonds has been regularly paid, and $389,000 has been paid on the principal of the stock contracts, leaving January 1, 1911, only $411,000 unpaid. These payments have been made out of the profits derived from the operation of the plant. The officers of the Gas Company are elected by the United Gas Improvement Company, who own and control all the stock, and these officers are also, in the main, the officers of the United Gas Improvement Company, and the latter controls the Gas Company and its business.

Various ordinances have been passed, regulating the price of gas, from which the Master finds as follows:

"1. That for the years 1896 and 7 the price of gas should be $1.30 per M. C. F. net; for the years 1898 and 9, $1.25 net; for the years 1900 and 1, $1.20 net; for the years 1902, 3 and 4, $1.15 net; and for the year 1905, $1.10 net; and for the years 1906 to 1910, $1.00 net with the proviso that it may add 10 cents per M. C. F. to each of these prices but shall be required to discount that sum for the payment by or before the 15th day of the month following that in which the gas was consumed.

"2. That the City pay for the term of fifteen years for each street lamp, $18.00 per year, until they should reach 500, when it should be reduced to $17.00 for each lamp.

"3. That its gas should not be less than 22 candle power."

There is no question of the authority of the City of

Des Moines, under the laws of the State, to regulate the rates at which gas shall be furnished to the City of Des Moines and its inhabitants. After valuing the real estate and various items of personal property as hereinafter stated, the Master adopted as the only practical way in his judgment of determining the reasonable value of the buildings, their contents, the yard structures and the mains, house and street lamp services and meters, the process of estimating the cost of reproducing them new, and then estimating the depreciation which should be deducted, in order to obtain their present value. Under this method, the Master summed up the value of the property of the Gas Company as follows:

"The new ordinance deprives the complainant of the right to add ten cents per M. C. F. to the price of gas, unless paid on or before the 15th day of the month following that in which the gas was consumed, and the evidence shows that the average working capital for the past five years was $120,000, and that when the ordinance went into effect, that they were then using $142,000 as working capital.

"Without the means of enforcing prompt payment, and without any inducement so to do, on the part of their customers, in my judgment the working capital should not

| | |
|---|---:|
| be diminished, and the amount allowed is ...$ | 140,000 |
| To this add real estate...................... | 150,000 |
| To organization expenses.................. | 6,923 |
| To meters in stock........................ | 6,603 |
| Present value of physical property aside from above items........................ | 1,937,402 |
| "Total physical value.............$ | 2,240,928" |

What is called in this summary "the present value of physical property," the report shows was arrived at by the Master in the manner following: He first found what he thought was the base value of the property, i. e., "what

it would cost to produce it at the present time new, without adding thereto any overhead charges." This figure he fixed at $1,975,026. To this he added overhead charges, fifteen per cent.,—$296,254. From this he deducted depreciation, $333,878, leaving as the value of the property thus ascertained, $1,937,402.

As appears from the opinion of the court and the arguments of counsel in this case, exceptions to the Master's report so far as the Gas Company is concerned pertain principally to two questions: One as to his manner of dealing with what is termed the "going value" of the concern, and the other as to the addition of the sum of $140,000 to the valuation, because appellant insists, upon the plan of valuation by cost of reproduction less depreciation, it would cost that sum to take up and replace pavements not laid when the mains were put in but necessary to be removed and replaced in the reproduction thereof.

Before considering the correctness of the rulings of the Master and their confirmation by the District Court, it is proper to notice that there is considerable difference between counsel as to what the Master actually found, as to whether he included the sum of $300,000 which he was disposed to allow for going value in the $2,240,000 valuation found by him, or whether it was added to the estimate of the value of the property already made by him.

We think the Master intended to value the property at $2,240,000 exclusive of the $300,000 which, as we have said, he was at first disposed to allow for going value, and also that he deducted, in reaching the $2,100,000 the $140,000 claimed by the Gas Company as a proper allowance because of the cost of removing and replacing pavements, as above stated. We think too, that it was the Master's conclusion that, if the $300,000, which he was at first disposed to allow, as stated, or the $140,000 for paving, were included, the valuation of the plant would be such that a fair return could not be made upon the value

of the property, and therefore the Company would be entitled to a decree in its favor.  It therefore follows that the determination of the correctness of the decree below, confirming the Master's report, depends upon and requires a consideration of these two items.

We may premise that the public authority is presumed to have acted fairly, and that the burden of proof is upon the Gas Company to show that the regulating ordinance has the effect to deprive it of an income equivalent to a fair return upon its property dedicated to public use. *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1.

As we have said, the Master was at first disposed to allow $300,000 as a separate item covering the going value of the concern.  After stating that he fixed the going value at the sum of $300,000 he says:

"It may be asked on what basis this amount is determined.  The evidence followed strictly might require me to make it higher, could my mind rest satisfied that the 'Going Value' of this concern is worth more, but I cannot feel satisfied that such is the case, and regard $300,000 as every dollar it is worth over and above its physical value, and in my judgment, it is worth that much more than a plant would be that had to develop its business.  But that would be much more rapid, in my judgment, than is estimated.  I think a purchaser would be willing to add this amount for its developed business, and that a seller would not be willing to sell unless he got that much more than its physical value, but I could not give the mental process by which this conclusion is reached any more than a jury could do so, under like circumstances, but it is nevertheless my judgment under all the evidence in the case.

"The element of 'Good Will' as applied to the ordinary merchant or manufacturer dealing with the public generally is not considered in estimating the 'Going Value' of Complainant's plant.  It cannot be considered in a

public utility like the one in question in this case, because the Complainant has a monopoly of the business in which it is engaged in the City of Des Moines, and those who desire to use its product must buy of it. They have no choice in the matter. But there is a great difference even in a monopoly which has a business already developed and one that must develop it. The plant of Complainant has all its parts working in harmony, performing their several functions in producing and conveying the gas to its customers. These several parts are not only in place, but have been brought to a harmonious operation throughout. Even the employés of the concern are familiar with their duties and experienced in performing them. But without business no matter how perfect it may be, it would be unprofitable. It is ready, however, for business, and has the business to transact. It was a small concern at the start in 1864, but its books show that it has had a steady growth for many years in the past, and everything indicates that it will continue in the future. There is great difference between such a plant and one whose business must be developed. All a purchaser of such a plant would have to do would be to take charge of the plant, 'Touch the button,' and he is making money from the start. There is no element of uncertainty connected with it.

"He can retain its experienced employés as a rule, should he so desire, at the same wages. There is no question that such a plant has a 'Going Value,' because it is a money maker from the start.

"The only difficulty is to determine how much its 'going value' is worth. No interest during its construction is allowed, nor anything that is included in the 'Overhead Charges,' which are part of the physical value. But simply the fact that it has a developed business that will make money for its owner, with reasonable rates allowed for the product which it manufactures and sells."

That "good will," in the sense in which that term is

generally used as indicating that element of value which inheres in the fixed and favorable consideration of customers, arising from an established and well-known and well-conducted business, has no place in the fixing of valuation for the purpose of rate-making of public service corporations of this character, was established in *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 52. "Going value," or "going concern value," i. e., the value which inheres in a plant where its business is established, as distinguished from one which has yet to establish its business has been the subject of much discussion in rate-making cases before the courts and commissions. Many of those cases are collected in Whitten on "Valuation of Public Service Corporations," §§ 550–569, and the supplement to the same work, §§ 1350–1385. That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use. Each case must be controlled by its own circumstances, and the actual question here is: In view of the facts found, and the method of valuation used by him, did the Master sufficiently include this element in determining the value of the property of this Company for rate-making purposes?

Included in going value as usually reckoned is the investment necessary to organizing and establishing the business which is not embraced in the value of its actual physical property. In this case, what may be called the inception cost of the enterprise entering into the establishing of a going concern had long since been incurred. The present company and its predecessors had long carried on business in the City of Des Moines, under other ordinances, and at higher rates than the ordinance in question established.

For aught that appears in this record, these expenses may have been already compensated in rates charged and collected under former ordinances. As we have said, every presumption is in favor of the legitimate exercise of the rate-making power, and it is not to be presumed, without proof, that a Company is under the necessity of making up losses and expenditures incidental to the experimental stage of its business.

These items of expense in development are often called overhead charges, for which, as we have already seen, the Master allowed fifteen per cent. upon the base value (exclusive of real estate), or $296,254, in addition to his allowance of $6,923 for organization expenses. Of these charges the Master said:

"In reaching the physical value of the plant in question by the process of reproduction, it is necessary to bear in mind that the present value thereof represents much more than the machinery therein, the labor of installing and constructing them, and putting them in place to perform their various functions, ready for the manufacture and distribution of gas to its customers. Were the City of Des Moines without such a plant, and such a one as the Complainant now owns was proposed, it would be found that much more than the mere cost of labor and material would be expended. Such expenditures are termed overhead charges, and are as follows:

"1. Time and money expended in the promotion of the enterprise, in the organization of the company and interesting capital therein, including, also, legal expenses, obtaining the necessary franchise, as well as the costs of incorporating the company.

"2. Then a competent engineer must be employed to prepare the plans and specifications for the plant, and make the necessary surveys, and when the work began, to superintend the construction thereof, and see that it is done properly and according to plans and specifications.

The successful operation of the plant depends largely upon its proper construction.

"3. Then losses arising from accidents and injuries to workmen as well as the material during its construction, which is such an amount as the cost of insuring against such losses, which is between 1 and 2 per cent.

"4. Contingencies are such expenditures as arise from the lack of foresight and care in preparing the plans and specifications. No matter how careful the engineer may prepare them, such expenditures invariably arise. Mr. Alvord testified that his allowance therefor would depend very much upon his knowledge of the engineer who prepared them, but that no matter who prepared them, they would invariably occur, and an allowance should be made therefor. The careful and thorough inventory in this case reduces very greatly the allowance therefor.

"5. The cost of administration, which includes the time and money expended by the parties who are engaged in the enterprise, purchasing the material, procuring the money for their payment as needed, and generally superintending the entire enterprise during the construction of the plant.

"6. It is estimated that it would take three years to complete the plant in question, and that at least one-half the time and money invested therein would give no return, and that a loss of interest would result therefrom and that such loss would be included in the overhead charges.

"7. Taxes during the construction.

"The latter is regarded by me as very questionable. It is in a certain sense making taxes an asset rather than a liability, and the amount is so vague and uncertain that it has been given very little consideration and weight in fixing the overhead charges. Either the money or the property should pay taxes.

"It must be borne in mind that these expenditures are all made during the promotion and construction of the

plant, and are necessarily a part of the cost thereof. No overhead charges that do not inhere in and add to the cost thereof, should be allowed as a part of its physical value. It is not a question of what was actually expended therefor in the plant in question, but what would it cost to reproduce a similar plant at the present time. It is through this method we reach the present value of this plant new, and then when it is properly depreciated, according to the condition, life and age of its various parts, we reach the present value of the plant in its present condition. It is not a perfect method, but it is the best method therefor, and results as nearly as possible in giving the present value of the plant. No other method known has proved so satisfactory."

The matter of going value was alluded to in *Knoxville* v. *Water Co.*, 212 U. S. 1. In that case, $10,000 was allowed for organization, promotion, etc., and $60,000 for "going concern." Of the latter item this court said (page 9): "The latter sum we understand to be an expression of the added value of the plant as a whole over the sum of the values of its component parts, which is attached to it because it is in active and successful operation and earning a return. We express no opinion as to the propriety of including these two items in the valuation of the plant, for the purpose for which it is valued in this case, but leave that question to be considered when it necessarily arises. We assume, without deciding, that these items were properly added in this case."

The question was presented in *Gas Co.* v. *Cedar Rapids*, 223 U. S. 655. That case was a writ of error to a judgment of the Supreme Court of Iowa, holding valid a certain ordinance regulating the price of gas in Cedar Rapids (144 Iowa, 426), and the judgment of the Iowa court was affirmed. Dealing with the question of "going value," the Iowa Supreme Court said:

"Also the sum of $100,000 was included by these wit-

nesses as enhancement of value by reason of being a 'going concern.' As previously intimated, the value of the plant is to be estimated in its entirety, rather than by the addition of estimates on its component parts, though the latter course will materially aid in determining the value. Advantages have accrued through the sagacity of its management as contended by appellant. So, too, there are the inevitable mistakes which would not be likely in the construction of a new plant; but to put a new plant in profitable operation time would be required, and, aside from the intangible element of good will, the fact that the plant is in successful operation constitutes an element of value.

"As said, the value of the system as completed, earning a present income, is the criterion. In so far as influenced by income, however, the computation necessarily must be made on the basis of reasonable charges, for whatever is exacted for a public service in excess of this is to be regarded as unlawful.

"Save as above indicated, the element of value designated a 'going concern' is but another name for 'good will,' which is not to be taken into account in a case like this, where the company is granted a monopoly. *Water Company v. Cedar Rapids*, 118 Iowa, 234; *Willcox v. Consolidated Gas Co.*, 29 Sup. Ct. 192. The witnesses for plaintiff took into account 'good will' in giving their opinion of the enhancement in value because of being a going concern, and we have no means of separating these so as to ascertain their estimate of the separate advantage of completion so as to earn a present income."

Dealing with the assignment of error which attacked the correctness of the ruling of the Iowa court upon this point, this court said (page 669):

"Then again, although it is argued that the court excluded 'going value,' the court expressly took into account the fact that the plant was in successful operation. What

it excluded was the good will or advantage incident to
the possession of a monopoly, so far as that might be sup-
posed to give the plaintiff the power to charge more than
a reasonable price. *Willcox* v. *Consolidated Gas Co.*, 212
U. S. 19, 52. An adjustment of this sort under a power
to regulate rates has to steer between Scylla and Charyb-
dis. On the one side if the franchise is taken to mean that
the most profitable return that could be got, free from
competition, is protected by the Fourteenth Amendment,
then the power to regulate is null. On the other hand, if
the power to regulate withdraws the protection of the
Amendment altogether, then the property is naught. This
is not a matter of economic theory, but of fair interpreta-
tion of a bargain. Neither extreme can have been meant.
A midway between them must be hit."

As we have already said, the Master, while at first dis-
posed to allow the additional sum of $300,000 for "going
value" as a separate item, after the decision of this court
in the *Cedar Rapids Case* seems to have reached a different
conclusion, for he said of that case:

". . . it also renders it extremely doubtful that
'Going Value' will be included in the valuation of such
a plant as the basis of return, beyond the fact that it is
in 'successful operation.' That would exclude the sum
of $300,000 estimated in this case, on the grounds that
when the ordinance was enacted, it already possessed a
well developed and paying business.

"In my judgment, after considering the able and thor-
ough arguments of counsel, that it is decisive of the ques-
tion, and holds that 'going value' should not be consid-
ered in determining the basis upon which the complainant
is entitled to have its return reckoned, and feel that it is
my duty to so state.

"The physical value as hereinbefore determined, is
reckoned upon the fact that the plant was in 'successful
operation' when the ordinance was enacted, otherwise its

value would be much less. The 'going value' is that enhancement which results from a well developed and paying business. This would result in reducing the estimated deficit for each year $24,000, and yield a return to the Complainant of, at least, 6 per cent. on $2,100,000.

"While this case is close to the border line, I cannot say on the whole case that the evidence beyond any just and fair doubt, satisfies me that the rates will prove confiscatory, should the ordinance be put into effect and an actual test thereof be made."

While there is a difference between court and counsel as to what the Master meant by this, we think it is apparent that he meant to say that, applying the rule of the *Cedar Rapids Case,* he had already valued the property in the estimate of what he called its physical value, upon the basis of a plant in actual and successful operation; for he said that otherwise its value would be much less.

As pointed out in the *Cedar Rapids Case,* if return is to be regarded beyond that compensation which a public service corporation is entitled to earn upon the fair value of its property, the right to regulate is of no moment, and income to which the corporation is not entitled would become the basis of valuation in determining the rights of the public. When, as here, a long established and successful plant of this character is valued for rate-making purposes, and the value of the property fixed as the Master certifies upon the basis of a plant in successful operation, and overhead charges have been allowed for the items and in the sums already stated, it cannot be said, in view of the facts in this case, that the element of going value has not been given the consideration it deserves and the appellant's contention in this behalf is not sustained.

As to the item of $140,000, which, it is contended, should be added to the valuation, because of the fact that the Master valued the property on the basis of the cost of reproduction new, less depreciation, and it would be

necessary in such reproduction to take up and replace pavements on streets which were unpaved when the gas mains were laid, in order to replace the mains, we are of opinion that the court below correctly disposed of this question. These pavements were already in place. It may be conceded that they would require removal at the time when it became necessary to reproduce the plant in this respect. The Master reached the conclusion that the life of the mains would not be enhanced by the necessity of removing the pavements, and that the Company had no right of property in the pavements thus dealt with, and that there was neither justice nor equity in requiring the people who had been at the expense of paving the streets to pay an additional sum for gas because the plant, when put in, would have to be at the expense of taking up and replacing the pavements in building the same. He held that such added value was wholly theoretical, when no benefit was derived therefrom. We find no error in this disposition of the question.

Nor do we think there was error in refusing an injunction upon the conclusion reached that a return of 6 per cent. per annum on the valuation would not be confiscatory. This is especially true in view of the fact that the ordinance was attacked before there was opportunity to test its results by actual experience. It is true the Master reported that in his opinion the Company ought to earn 8 per cent., but he also found that in his judgment gas could be produced for 60 cents per thousand, and the actual effect of the 90 cent rate on an economically managed plant had not had the test of experience.

The decree of the court below is peculiar in that it directs the dismissal of the bill "with prejudice," and adds, "At any time on and after three years from this date complainant, its successor or assigns, may on motion reinstate this case with all the pleadings and evidence now on file, with the same and like effect as though filed for such sub-

sequent hearing. And each party may then file such additional pleadings and take and file such additional evidence as to each party may be deemed advisable."

While we agree with the court below that it was right to confirm the Master's report and dismiss the bill, we think, in view of the fact that the attack upon the rates was made before the ordinance went into effect, and before actual application of the rates could demonstrate whether they were remunerative or not, that the court should have followed the recommendation of the Master and dismissed the bill without prejudice. We think this is particularly so, in view of the fact that ordinarily time alone can satisfactorily demonstrate in a case like this whether or not the rates established will prove so unremunerative as to be confiscatory in the sense in which that term has been defined in rate making cases. The Master's suggestion has the support of the judgment of this court in *Knoxville* v. *Water Co.*, 212 U. S. 1, and *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19.

With the modification that the bill be dismissed without prejudice, instead of, as the court below directed, with prejudice, the decree is affirmed, with costs.

*Affirmed.*