**PICHOTTA v. CITY OF SKAGWAY et al.**

No. 5767–A.

District Court, Alaska. First Div. Juneau.
July 27, 1948.

1000

Faulkner, Banfield & Boochever, of Juneau, Alaska, for plaintiff.

Howard D. Stabler, of Juneau, Alaska, for defendants.

FOLTA, District Judge.

This is an action brought by plaintiff who, in the name of the Skagway Public Service Company, operates a public utility consisting of the light and power plant and distribution system leased from the Home Power Company, to enjoin the City of Skagway from enforcing an ordinance, effective October 1, 1947, on the ground that the rates fixed are unfair and unreasonable under local law and confiscatory under the Constitution of the United States.

Pending determination of the suit the defendant was restrained from enforcing the ordinance and the excess paid by consumers over the old rates ordered impounded.

Before enacting the ordinance referred to, the City Council held hearings in conformity with the provisions of Sections 2402, 2403, C.L.A.1933, at which the plaintiff was present and accorded adequate opportunity to present his case, and found that, as of December 31, 1946, the capital invested in the utility, less accrued depreciation and plus a working capital of $3500 and an allowance of $5434.96 for materials and supplies, was $41,700, which it adopted as the rate base (Defendant's Exhibits C and G). It further found that a return of 7% on this rate base, yielding $2919 a year, was fair and reasonable. Then, using the plaintiff's report to the City of his

operations for the calendar year 1946, the City found that, after allowing for an estimated loss of revenue under the new rates of $2500 a year, and a further estimated loss of $5000 by reason of the removal of a large consumer from Skagway, future revenue would exceed expenses by more than $3200 a year. At the final hearing before the City Council the plaintiff, while expressing some doubt as to the sufficiency of the amount allowed for operating expenses, declared that he was satisfied with the new rate schedule and was convinced that the resultant decrease in revenue would be offset within a year by increased consumption of electricity.

The findings of the Council are recited in the ordinance (Defendant's Exhibit L). Among other things, the ordinance provides that the plaintiff may petition the Council for modification of, or change in, the rates and charges if they should become, or appear to be, unreasonable or such as not to permit a fair and reasonable return on its invested capital. Several months later the plaintiff's petition for an increase in the rates was denied by the City, and upon the plaintiff's threat to discontinue service the City obtained an order restraining him from doing so.

At the trial in June, 1948, it was shown on behalf of the City that, after revising plaintiff's report to the City for the calendar year 1947 (Plaintiff's Exhibit No. 13) to conform to the accounting practices prescribed by the Federal Power Commission for public utilities, operating costs were $45,499.12, as against operating costs of $55,795.79 and an operating revenue of $51,309.08 reported by the plaintiff. The difference between operating costs, as found by the City, and the revenue reported by plaintiff, which was accepted as correct, would more than suffice to meet the estimated loss of revenue of $2500 and yield the return fixed by the City at $2919. The Council found that, although the original cost of the plants of the Northwest Light & Power Company and the White Pass & Yukon Route is no longer ascertainable from the inadequate records in existence, the properties had been fully depreciated long before they had been acquired by the plaintiff, and that as of December 31, 1946, according to plaintiff's records, the invested capital of the Home Power Company, less accrued depreciation actually taken, was $4611.79, while that of the Skagway Public Service Company was $28,153.25 (Defendant's Exhibits E, F and G). In fixing the rate base the City treated the terms "original cost" and "invested capital" as convertible.

Plaintiff now contends that not only is the revenue inadequate to pay operating costs under the new rate schedule but that the principal component of the rate base should be the present fair value of the utility rather than the net original cost of the property when first devoted to the public service or the net capital investment. The correctness of the rate base formula used by the City and of the estimates of probable future operating revenue and costs in the face of rising prices, as well as the revision thereof by the defendant in conformity with the Federal Power Commission standards, are challenged by the plaintiff.

The evidence discloses that before 1909 the City of Skagway was served by the Northwest Light & Power Company and the White Pass & Yukon Route; that in 1909 the Home Power Company acquired the property of the former for $15,000 and leased the distribution system of the latter for the consideration of one dollar a year and the maintenance of the system in substantially the same condition as when leased. There was some testimony from which it could be inferred that a special low rate, which defendant contends violates Section 2412, C.L.A.1933, prohibiting discriminatory practices on the part of public utilities which the new rate schedule adopted by the ordinance was designed to correct, was also a consideration.

In 1933 the plaintiff leased the Home Power Company properties and has ever since operated them in the name of the Skagway Public Service Company. Under a contemporaneous agreement and as a part of the lease transaction, plaintiff undertook to buy and has since bought 88.2% of the capital stock of the Home Power Company, but neither this agreement nor the lease provides for the sale of the properties of the Home Power Com-

1004

pany, and at the time of the trial plaintiff was still operating under the lease while the franchises were held by the immediate predecessors of the Home Power Company.

■ The first question raised is whether this Court is bound by the findings of the City, if supported by substantial evidence. If so, the Court would necessarily be limited to a consideration of the evidence presented before the Council. There is no statutory provision for appeals from rate orders, but it appears to be settled that, where, as here, a constitutional right is involved, the Court may determine the issue upon its own record and the evidence adduced before it, even though it had not been presented to the regulatory body. Atlantic Coast Line R. Co. v. Public Service Commission, D.C., 77 F.Supp. 675; Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 368, 369, 56 S.Ct. 797, 80 L.Ed. 1209; Prendergast v. N. Y. Telephone Co., 262 U.S. 43, 50, 43 S.Ct. 466, 67 L.Ed. 853; Cromwell v. Benson, 285 U.S. 22, 60, 52 S.Ct. 285, 76 L.Ed. 598; City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 8, 29 S.Ct. 148, 53 L.Ed. 371. This procedure would appear to be proper and in any event necessitated by the lack of anything but a meager and fragmentary record of the proceeding before the Council. Accordingly, the trial was essentially de novo in character, and the evidence produced related to the actual operations of the utility to the end of May, 1948, coupled with forecasts and prophecies as to future revenues and expenses.

■ In its consideration of the mass of evidence produced, the Court is aided by well-settled rules governing litigation of this kind, namely: (1) That the orders of a regulatory body are presumptively valid, reasonable and correct, Des Moines Gas Co. v. Des Moines, 238 U.S. 153, 163, 35 S.Ct. 811, 59 L.Ed. 1244; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U.S. 372, 374, 39 S.Ct. 117, 63 L.Ed. 309, 9 A.L.R. 1420; (2) that the burden of proof on the issue of confiscation is on the one raising it, and that nothing less than clear and convincing proof will justify judicial interference, Willcox v. Consolidated Gas Co., 212 U.S. 19, 41, 29 S.Ct. 192, 53 L.Ed. 382, 48 L.R.A.,N.S., 1134, 15 Ann.Cas. 1034; City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 8, 16, 18, 29 S.Ct. 148, 53 L.Ed. 371; San Diego Land & Town Co. v. National City, 174 U.S. 739, 750, 754, 19 S.Ct. 804, 43 L.Ed. 1154; Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 169, 54 S.Ct. 658, 78 L.Ed. 1182; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333; (3) that the Court cannot substitute its judgment for that of the authority whose action is under review upon a question as to which there is room for a difference of intelligent opinion, St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 51, 56 S.Ct. 720, 80 L.Ed. 1033; San Diego Land & Town Co. v. National City, 174 U.S. 739, 750-752, 19 S.Ct. 804, 43 L.Ed. 1154.

## Rate Base

■ Section 2383, C.L.A.1933, provides that municipalities shall have the power:

"To regulate, fix and establish and from time to time change, as they shall deem fit and proper, all rates and charges that may be charged for services rendered to the municipalities or to the inhabitants thereof by any public service association, corporation or individual, including the right to regulate and provide what shall be a reasonable deposit for meters and security for service to be rendered, and to provide that interest be paid on such deposit; provided that all rates, charges, and regulations shall be reasonable, and such as to permit a fair and reasonable return by way of interest or dividends on invested capital."

As already shown, the City treated the terms "invested capital" and "original cost" as synonymous in fixing the rate base at $41,700. Plaintiff contends not only that the original cost or invested capital is much greater than that found by the Council but also that the term "invested capital" should be construed to mean fair value, and argues that any utility should have the benefit of any appreciation in value and that in any event the term should not be limited to the capital invested in the first instance but should be construed to mean that

which is paid for a utility by any subsequent purchaser.

The fair value doctrine established by Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, was recognized as being in general ill repute, and finally abandoned, in Federal Power Commission v. Hope Natural Gas. Co., 320 U.S. 591, 648, 64 S.Ct. 281, 88 L.Ed. 333, under a statute which, unlike that here involved, did not even require that invested capital or original cost be used as the rate base. For a critique on the fair value doctrine see Justice Brandeis' dissenting opinion in State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 289-312, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807. The adoption of his views twenty-two years later in Federal Power Commission v. Hope Natural Gas Co., supra, was forecast by the attack on the doctrine in Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 604-606, 62 S.Ct. 736, 86 L.Ed. 1037 and the trend now seems to be toward the acceptance of the original cost or net investment rate base and away from the complexities of the fair value doctrine and the endless controversy which it engenders. The argument that appreciated value should be added to the capital invested is therefore merely an argument for the fair value doctrine. The appreciation in value represents no additional capital investment, and it is manifest that, if the utility were operated by defendant, no appreciation in value would have any effect on the rates. Clearly, the consumer should not be required to pay more for the service merely because the utility is privately operated.

There is much plausibility in plaintiff's argument that the capital referred to in the statute should not be limited to that of the initial investor but should be construed to mean the capital invested by the last purchaser, and such a construction might be permissible under the statute to avoid hardship in a case where the change of ownership was bona fide and not merely colorable for the purpose of increasing the rate base. But it should be noted that this argument is likewise applicable to original cost, which is defined by the Federal Power Commission to be the cost of the property to the person who first devotes it to the public service, regardless of the number of times the utility has changed hands. This may seem to be a harsh rule, but it would appear to be necessary to avoid a conversion of original cost into fair value, which would certainly follow in view of the fact that the sale price of any property usually approximates fair value or is arrived at by capitalizing the earnings. The purchase by plaintiff of 88.2% of the capital stock of the Home Power Company is a case in point. In arriving at the purchase price he testified that he was influenced by the earnings and the cash surplus of $72,000.

Manifestly, there would be no stability to rate bases, and the order of any regulatory body fixing a rate base could be circumvented by the mere device of successive changes in ownership. It was undoubtedly the recognition of this danger that led the Federal Power Commission to adopt the rule referred to and, while the rules and practices of that body are not binding on this Court, the Court takes judicial knowledge of the fact that the Commission is composed of experts on utility regulation whose judgment is entitled to great weight.

The point made by plaintiff, that the rate base is inadequate to yield a fair return at the rate allowed because of the decrease in the purchasing power of the dollar, may be answered by directing attention to the fact that interest rates are determined by the supply of money rather than by the commodity price level. Undoubtedly, however, a public utility should be allowed a correspondingly greater working capital and reserve for capital expenditures in a period of rising prices.

Plaintiff's argument with reference to the foregoing matters would have much force if he were engaged in private business, but he is a public servant, a substitute for the state. He has a monopoly and is secure against competition. All he is entitled to is a reasonable return on his net capital investment, represented by property actually used and useful in the public service, and then only provided that his operation is efficient and economical.

There is nothing unfair in this. Sooner or later every municipality is faced with the duty of making a choice of two courses —to provide essential services to its inhabitants or delegate that function to private operation. If it chooses the latter, it has a right to expect that the service will cost little, if any, more than if it chose the first course. Manifestly, this object cannot be attained unless the return is confined either to original cost or invested capital, as distinguished from fair value which is usually several times greater.

Plaintiff also contends that there should be included in the rate base $39,973 expended by the Army in rehabilitating plaintiff's system during the one year of the recent war that the Army operated the utility under a lease. For these additions, upon termination of the lease, plaintiff paid the Army $4800, which was included in the rate base. It is argued that these additions come within original cost as defined by the Federal Power Commission. Literally construed, this is true, but clearly the rule was never intended to embrace a gratuitous contribution to capital made at the taxpayers' expense. Moreover, in making these additions the Army was undoubtedly motivated primarily by military considerations, and expense was no object.

Finally, plaintiff contends that there should be included in the rate base $38,000, representing uncompensated labor performed by himself and his wife. Not only was this labor not capitalized but there was no segregation of it, so that it is impossible to tell from his records what part of it was properly chargeable to capital account.

The failure of the City to include in the rate base the original cost of the public utility operated by the White Pass & Yukon Route, alleged to have been $17,500 at the time it was leased by plaintiff's predecessor, the Home Power Company, is also urged as error. It will be recalled that there were two rival public utilities in Skagway, the Northwest Light & Power Company and the White Pass & Yukon Route, until 1909 when the Home Power Company purchased the properties of the former for $15,000 and leased those of the latter for a yearly rental of one dollar, and in consideration of a special rate for current and the maintenance of the properties in the condition in which they were when leased. It is but reasonable to presume that when the Home Power Company acquired these properties there was a considerable duplication of facilities requiring the elimination of some in the ensuing consolidation. Obviously, the property eliminated upon consolidation was neither used nor useful in the public service and, hence, would not be includible in the rate base. What the original cost was of the part that was retained cannot now be determined, but manifestly it was not $17,500, less accrued depreciation, but something considerably less. But neither the original cost of the White Pass & Yukon Route nor the part retained was ever capitalized by the Home Power Company, and there was no necessity for doing so because ever since 1909 the cost of replacements was charged to operating costs. Naturally under this arrangement subsequent additions by the Home Power Company were not capitalized, so that whatever remained of original cost was ultimately wiped out long before plaintiff leased the utility from the Home Power Company in 1933. Under such a practice, which has been continued by the plaintiff, it is not surprising that nothing remained of original cost in 1947 to include in the rate base for, where the parties agree that the cost of maintenance of an asset should be treated as a current business expense, there is no capital investment. Peerless Stages v. Commissioner, 9 Cir., 125 F.2d 869, 871. Not until plaintiff discontinues charging replacements to operating cost can he properly begin to capitalize replacements made thereafter in the property of the White Pass & Yukon Route. Detroit Edison Co. v. Commissioner, 6 Cir., 131 F.2d 619, 622. The City found that the capital invested in the White Pass & Yukon Route had been fully recouped from earnings long before plaintiff acquired the property, and that there was nothing to include in the rate base. In this the Court cannot say the Council erred.

Plaintiff further contends that depreciation should be allowed on the basis of value rather than on cost, as held in United Railways & Electric Co. v. West, 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390, but this doctrine was overruled in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 606, 64 S.Ct. 281, 88 L. Ed. 333.

The circumstance, that the investment was made or cost incurred before the statute authorizing regulation went into effect in 1923, would seem to be wholly irrelevant. No one has a right to assume that the law will remain unchanged. Likewise, the absence of rules prescribing a depreciation schedule, etc., is irrelevant where the regulatory body, as here, takes into consideration only the depreciation actually taken by the utility in the past. This is neither retroactive regulation nor the exercise of quasi judicial powers.

Careful search on the part of counsel and Court for judicial authority on the meaning of invested capital, as used in statutes governing the regulation of public utilities, has been fruitless. Manifestly, capital invested would equal the original cost except upon a subsequent sale of the public utility for a greater price than the original investment. But for the reasons already stated the Court holds that invested capital, as used in Paragraph 10 of Section 2383, C.L.A.1933, means the initial investment, regardless of subsequent changes in ownership, plus capital additions and minus accrued depreciation. It follows that the action of the City in treating the term invested capital as synonymous with original cost is not incorrect.

I conclude, therefore, that the plaintiff has failed to show that the rate base adopted by the defendant is such as to preclude a fair and reasonable return on the capital invested.

## Operating Costs

The crucial question in this controversy, however, is whether the rates will produce sufficient revenue to meet operating costs. Defendant argues that, since the plaintiff is authorized under the ordinance to apply for relief at any time and required to make a report of operations in detail at the end of each calendar year, it is immaterial that the new rates may prove insufficient at some time in the future. To this the plaintiff replies that the picture has changed materially since December 31, 1946, and in support of his assertion that expenses now exceed revenue, points to his reports for the calendar year 1947 and for the year ended June 30, 1948 (Plaintiff's Exhibit Nos. 13 and 2, respectively) which on their faces show substantial deficits.

Plaintiff's Exhibit No. 13 shows a deficit of $3827.44 under the old rates for the calendar year 1947. As analyzed and revised by the defendant in its Exhibit M, however, the deficit is converted into a surplus of $371.29. The defendant does not question the revenue reported by plaintiff of $51,309.08, but makes certain deductions from operating expenses reported as $55,136.52. Thus defendant amortized over five years expenses listed on Page 2 of its Exhibit M, amounting to $2990.28 because, it asserts, they are non-recurring. Perhaps it would be more accurate to describe them as expenses that do not recur annually. I find that the plaintiff has failed to show that this amortization and deduction of $2392 from operating expenses are improper. Defendant further amortized, over a three year period, expenses amounting to $2072.13, listed on Page 3 of Exhibit M as extraordinary power house repairs, resulting in a deduction of $1401.10. I likewise find that plaintiff has failed to sustain the burden as to this item. The same finding is made as to the item of $970 (less $75 which was erroneously deducted by defendant), and the item of $3060, paid to the Home Power Company as rental, both of which were improperly charged to operating cost. I agree with the defendant that the payment of what has been referred to as a pension to one of plaintiff's employees, should not be at the consumers' expense, unless it is shown to be in pursuance of a pension system regularly established. Plaintiff asserts that the employee performs essential services, but his designation of him as "pensioner" would seem to refute this. The choice of language em-

ployed, with all its connotations, is the plaintiff's, and he should be bound by it. Defendant, however, has deducted this item, amounting to $1682, only in connection with the finding that this employee could in any event be dispensed with if the power house were placed on a forty-hour week basis to obviate the payment of overtime. From the depreciation claimed by the plaintiff in the amount of $2846, defendant has deducted $901.30 on several grounds, one of which is that the rates charged as to Caterpillar diesel motors were excessive. The testimony of defendant's witness on this point, however, cannot be reconciled with its revision in Exhibit M. The witness Stuart testified that he changed the rate of depreciation on diesel motors from 10% to 5%, and that the diesel motor designated in Plaintiff's Exhibit 13 as "old cat" he charged off as fully depreciated in January, 1948, whereas plaintiff had charged it off in 1947, which resulted in a depreciation charge of $126 as against plaintiff's charge of $749.03, that he decreased the depreciation on the "G. M. Diesel" from $545.43 to $272.71, and on the "new cat" from $669.49 to $334.75, and on what is listed as "diesel unit" from $100 to $50; but the sum of these is not the amount deducted nor is the matter clarified by his testimony that he delayed charging depreciation on what the defendant has constructed or bought in 1947 to 1948.

Plaintiff testified that the rates of depreciation of the diesel motors referred to were in accordance with the recommendations of the manufacturer, and in this he was corroborated by the witness Whitehead, Branch Manager of the Northern Commercial Company, which sells and services Caterpillar diesels for the district which includes Skagway. This witness further testified that the service life of such motors is 8 to 10 years if they are run continuously and that their life is not prolonged even where, as here, the motors are operated only six months of the year, because, due to the inferior fuel now furnished, corrosion during non-use is sufficient to offset any saving in wear.

■ It is difficult to see any justification for postponing depreciation, as was done by the witness Stuart. I am constrained to hold that the plaintiff has sustained the burden of showing that the reduction in the rates of depreciation and postponing the taking of depreciation were improper. As thus revised, operating expenses would be $48,420.12, subject to a further revision of the item allowed for income tax of $613, leaving but $2888.96 to meet the loss of revenue under the new rates estimated at $2500 and the return of $2919 on the capital invested.

■ Plaintiff's Exhibit No. 2 is a report for the year ended June 30, 1948, showing operating revenue (actual for 11 months and estimated for June) of $46,551.46 under the old rates, which was computed to be $43,329.92 under the new rates or a decrease of $3221.54 under the new rates; and operating expenses, as corrected by the elimination of the item of $400, of $46,859.47, with a resultant estimated deficit under the new rates of $3529.08, before any return on invested capital.

Defendant strenuously objected to the introduction of Exhibit No. 2 on the ground of surprise, lack of opportunity to examine and analyze it or to compare it with plaintiff's records for the purpose of verification. Ordinarily evidence of occurrences subsequent to the filing of the complaint is inadmissible, but the exclusion of such evidence in an identical situation dealt with by the Court in City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 14, 15, 29 S.Ct. 148, 53 L.Ed. 371, was held to be error. This would seem to dispose of so much of defendant's objection as is predicated on the circumstance that the evidence relates to operations subsequent to those for the calendar year 1947 on which defendant acted in passing the rate ordinance. Incidentally, it should be noted that no supplemental pleading has been filed by the plaintiff. On the other hand, defendant could have demanded a further report from plaintiff of its operations, and in any event should have anticipated that plaintiff would introduce evidence as to earnings and expenses up to a short time before the trial. In the absence of proof that a request for an inspection of the plaintiff's books was de-

nied, defendant's objection to this evidence must be overruled on the authority of the case just cited.

Plaintiff, however, is in error in assuming that computing revenue and expenses at the new rates, as was done in his Exhibit No. 2, is equivalent to an actual trial under them. Whatever consumer resistance there is against the present rates would continue until the new rates went into effect. On the authority of Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S.Ct. 192, 53 L.Ed. 382, 48 L.R.A., N.S., 1134, 15 Ann.Cas. 1034; City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 29 S.Ct. 148, 53 L.Ed. 371; Des Moines Gas Co. v. Des Moines, 238 U.S. 153, 35 S.Ct. 811, 59 L.Ed. 1244, the decrease in revenue under the new rates, shown by Plaintiff's Exhibit No. 2 as $3221.54, must be regarded as a mere estimate. Because there has been no actual experience under the new rates, I am of the opinion that plaintiff's testimony on this point is insufficient to show that defendant's estimate of $2500 is incorrect. So considered Plaintiff's Exhibit No. 2 would show a deficit of $308 at the old rates instead of the $1072.33 claimed by plaintiff and $2808 under the new rates, before a return on the capital investment.

Defendant insists that Plaintiff's Exhibit Nos. 2 and 13 do not truly reflect current or future operations because of inefficient operation and improper accounting practices. Thus it is asserted that more than $10,000 a year could be saved by the installation of semi-automatic equipment in the power house, and a further saving by a full conversion from diesel to hydro generation of power. Defendant also points to the systematic practice of charging capital items to operating cost, which the witness Stuart testified amounted to approximately $2000 a year to 1941, resulting in the concealment of excessive profits. He further testified that such practice was continued to the time of the trial but that lack of time precluded him from determining the amount of such charges since 1940. He also testified that no time-slips are turned in by the employees, and all labor, regardless of wheth-

er performed on additions, betterments or replacements, is charged to operating expense to the great prejudice of the consumer, the effect of which is to show profits lower than they really are. In support of its point that the power house should be modernized, defendant cites the minutes of the Home Power Company of thirty-five years ago to the effect that the power house equipment was very inefficient and should be changed. Defendant also contends that the plaintiff has, since the rate hearings, purposely made extensive additions and repairs which were not necessary in view of the fact that the entire system was recently rehabilitated by the Army and that his purpose in doing so was to make a more favorable showing upon the trial.

Defendant also points out that, as shown by its Exhibit K, the net income of the utility averaged approximately $10,000 yearly from 1940 to 1947, and that, as shown by Plaintiff's Exhibit No. 4, its net income for the fiscal year ended June 30, 1947, was $7851. Defendant also argues that between 1908 and 1933 the Home Power Company received a return of $147,-227, on its investment of $27,000, which is too remote to be entitled to any weight now, and that since plaintiff took over the utility in 1933 he has paid from the earnings of the utility $63,343 for stock in the Home Power Company, $6000 on a note, and $45,900 in rentals to the Home Power Company, made additions amounting to $41,641, bought supplies costing $15,000, received $48,350 in salary, and acquired an equity of 88.2% in the surplus of the Home Power Company amounting to $26,000.

Defendant's witness Stuart testified that approximately $10,000 could be saved by the installation of semi-automatic equipment, and this was admitted by the plaintiff. But later plaintiff and his expert witness testified that such equipment is unobtainable without great delay, and his expert witness otherwise sharply contradicted Stuart as to the saving which might be effected. Viewed in any aspect, the testimony is too uncertain and speculative, and even if satisfactorily proved that the saving claimed would ensue upon the installation of such equipment, it would not warrant the subtraction of $10,000 from

operating expenses, but only the allowance of a lower rate of return for an inefficient operation.

 It is difficult to reconcile Plaintiff's Exhibit Nos. 2 and 13, showing deficits, as revised, of $605.30 and $2808 for the calendar year 1947 and the fiscal year ended June 30, 1947, respectively, with Defendant's Exhibit K, showing a yearly net income of approximately $10,000 for the period 1940–46, or with Plaintiff's Exhibit No. 4, in which he reports an income of $12,667, $7851 of which was derived from the utility, for the fiscal year ended June 30, 1947. This would seem to require explanation in view of the well-settled rule that the earnings and expenses of a utility must be measured by operations over several years, rather than by those of a particular year. It is one thing to submit figures on operating revenue and expenses which show a deficit, but it is quite another to explain why there is such a great drop in income, particularly in the six months which elapsed between June 30, 1947, and December 31, 1947, as Plaintiff's Exhibit No. 13 purports to show over his Exhibit No. 4, and if there had been a finding to the contrary by the City Council as to the income for the fiscal year ended June 30, 1948, and the Court had not limited the purpose for which Plaintiff's Exhibit No. 2 was admitted, it would now be held that plaintiff had failed to overcome the finding made by the Council, aided as it would be by the presumption of validity and correctness. But in view of defendant's admission that it had no reason to challenge the correctness of the figures embodied in Plaintiff's Exhibit No. 2, coupled with the reasons aforesaid, I find that, although the new rates were adequate when adopted, they are not sufficient now to provide a fair and reasonable return on the capital invested. I further find that, where the rates prescribed are not sufficient to meet operating expenses, there is not merely an incidental diminution in the value of plaintiff's property, such as would be unavoidable upon any exertion of the police power to fix rates which diminished income, but a confiscation in the constitutional sense.

I conclude, therefore, that the enforcement of the ordinance should be enjoined, without prejudice, however, to the right of the defendant to take such further proceedings as it may deem necessary in connection with the amendment of its ordinance.