## SOUTHERN BELL TELEPHONE & TELEGRAPH CO. v. RAILROAD COMMISSION OF SOUTH CAROLINA et al.

(District Court, E. D. South Carolina. April 30, 1925.)

No. 253.

1. **Equity** ⬤⇒410(7)—**Under circumstances, exceptions to master's report considered independently of presumption of correctness of findings.**

Without committing court to similar course in the future, exceptions to report of master would be considered independently and apart from any presumptions of correctness of master's conclusions on fact, in view of importance of case, going to constitutionality of rate fixing statute, and the fact that exceptions cover practically whole case on the merits.

2. **Constitutional law** ⬤⇒298(4)—**Telegraphs and telephones** ⬤⇒33(1)—**Rate limiting statute held confiscatory and unconstitutional as to telephone company.**

Act S. C. April 3, 1922 (32 St. at Large, p. 1050), limiting telephone rates, held, under facts, to be confiscatory and to amount to taking of property without due process, in so far as plaintiff company is concerned.

3. **Constitutional law** ⬤⇒70(1)—**Courts cannot make public utilities rates.**

Courts have no power to make rates for public utilities.

4. **Telegraphs and telephones** ⬤⇒33(1)—**Legislature can fix rates so long as not confiscatory.**

The Legislature, to guard the public, has power, by statute, or through an agency such as Railroad Commission, to fix rates for a public utility, so long as they are not so unreasonably low as to be confiscatory.

5. **Constitutional law** ⬤⇒298(1)—**In case of confiscatory rates, taking without due process of law.**

If public utility rates fixed by statute are confiscatory, there is a taking of property with-

out due process of law, within the inhibition of the Constitution.

**6. Telegraphs and telephones ☜33(1)—Rates fixed by statute presumptively reasonable.**

Public utility rates fixed by statute are presumptively reasonable, and a utility attacking them has the burden of showing by clear and convincing evidence that they are so unreasonably low as to be confiscatory.

**7. Public service commissions ☜7—Basis of calculation of reasonableness of public utility rates, fair value of property used.**

The basis of all calculations as to reasonableness of rates for a public utility must be the fair value of the property used by it for the convenience of the public.

**8. Public service commissions ☜7—Property of public utility used in intrastate business separated from that used in interstate business in determining reasonableness of state rate.**

For determination of reasonableness of rates prescribed by state statute for a public utility, the value of its property employed in intrastate business must be ascertained and considered entirely apart from that employed in interstate business; and such as is used jointly in the two must be apportioned between them according to the use that is actually made of it for such intended service.

**9. Public service commissions ☜7—Increase in value of public utility's property considered on fair rate.**

It is the fair value of a public utility's property at the time it is being used for the public, though it may have increased since acquisition of the property, which is to be considered in determining reasonableness of statutory rates.

**10. Public service commissions ☜7—Ascertainment of fair value of public utility's property for rate purposes, not controlled by artificial rules.**

Ascertainment of the fair value of the property of a public utility used for the convenience of the public, as a basis for determining the reasonableness of prescribed rates, is controlled by no artificial rules, and is not a matter of formulas, but there must be a reasonable judgment having its basis in the proper consideration of all relevant facts.

**11. Equity ☜407—Not error for master to state conclusions of law to show method of arriving at conclusions of fact.**

Though reference to a master is to find facts, it is not error for him in his report to state conclusions of law merely to show clearly how he arrived at his conclusions of fact.

**12. Public service commissions ☜7—Capital honestly and prudently invested not rate basis of public utility.**

A public utility is not limited to a fair return only on capital honestly and prudently invested, that not being the adopted rate basis.

**13. Public service commissions ☜7—Actual original cost of public utility's property shown for rate purposes, without historical cost.**

To show actual original cost of property of a public utility as an element of rate basis, a showing of historical cost, in the sense of what normally should have been paid for the property, is not necessary.

**14. Evidence ☜555—Labor condition experts testifying to reproduction cost may, making due allowance, consider estimates of work in previous years.**

Experts on labor conditions, in testifying to the reproduction cost new of the physical properties of a public utility, may consider estimates or studies of work in previous years; they in making their deductions making due allowance for the differences in prices and labor efficiency at the various times and places.

**15. Telegraphs and telephones ☜33(1)—Relative to state rate for public utility, whose plant extends through several states, general overhead charges properly apportioned.**

As bearing on the reasonableness of telephone rates prescribed by a state statute, relative to a company whose plant extends through several states, apportioning general overhead expenses incurred for the benefit of the whole plant to the several states in the proportion of the direct expenses in those states held, in view of testimony of experts, not objectionable.

**16. Telegraphs and telephones ☜33(1) — Equipment for future growth of municipality properly included in value for rate purposes.**

Equipment which a telephone company, in establishing its plant in towns and cities, lays down therein to provide for their future growth, not being such as can be readily placed in the plant when it is needed, and not being planned for an unreasonable time in the future, is properly included in the present value of its property, on which remuneration should be allowed; it not being idle capital in the proper sense of the term.

**17. Public service commissions ☜7—Depreciation for rate purposes of public utility better shown by actual personal physical examination.**

For ascertaining depreciation of the property of a public utility, for rate purposes, actual personal physical examination of the property by competent witnesses, and their estimate and opinion of the actual depreciation, is a better guide than the "straight line method" or the "curved line rule," which are highly theoretical.

**18. Public service commissions ☜7—Public utility's "depreciation reserve fund" not actual depreciation for rate purposes.**

The "depreciation reserve," shown by the books of a public utility, does not represent the actual depreciation of its properties, which is to be deducted from reproduction cost new to ascertain present value for rate purposes; but only what observation and experience suggest as likely to happen, with a margin over.

**19. Telegraphs and telephones ☜33(1)—Expenditures by public utility, under contract with company owning its stock, considered for rate purposes if fair.**

The fact, that the company which leases apparatus to plaintiff telephone company owns

plaintiff's stock and owns the controlling stock of another company with which plaintiff has a contract for purchase of supplies, does not require expenditures under those contracts to be in any way excluded from plaintiff's operating expenses, for rate purposes, so long as the contracts .and dealings under them are advantageous to plaintiff; but merely requires close scrutiny of the transactions to prevent imposition on the community.

**20. Public service commissions ⟨⟩7—Present value of public utility's property determinable for rate purposes, without showing of capitalization and bond issue.**

While capitalization and bond issue of a public utility are relevant facts, evidence thereof is not absolutely essential for the court to arrive at a conclusion of what is the present value of the utility's property, and whether the rates prescribed for it are confiscatory.

**21. Public service commissions ⟨⟩7—Reproduction cost, less depreciation, only one of factors in determining present value for public utility rates.**

Reproduction or replacement cost, less depreciation, is only one of the factors to be considered in determining the present value of the property of a public utility for rate purposes, and is not controlling.

**22. Costs ⟨⟩60—Divided equally in successful suit against public officers to enjoin enforcement of rate statute.**

Equal division of costs in suit by public utility against public officers to enjoin enforcement of statute, on the ground that the rates limited by it were confiscatory, would be directed as equitable under the circumstances, notwithstanding the plain case made by plaintiff.

Action by the Southern Bell Telephone & Telegraph Company against the Railroad Commission of South Carolina, the members thereof, and the Attorney General, individually and in their official capacities, and others, to enjoin enforcement of a statute as prescribing confiscatory rates. On, exceptions to report of special master. Report confirmed, and decree for plaintiff.

See, also, 280 F. 901; 299 F. 615.

The report of Special Master J. Waties Waring is as follows:

To the Honorable District Court of the United States for the Eastern District of South Carolina:

The above-entitled cause was referred to me as special master by order of the Honorable Henry A. M. Smith, United States District Judge, filed January 12, 1923, to take the testimony of the respective parties both within and without this district and make a report of the same to this court, and furthermore to report to the court my conclusions and recommendations as to what is the value of the complainant's property in South Carolina, what is the gross income of the com-

plainant, and what under all the circumstances should be its net income.

### Introductory.

In accordance with this order, I have held numerous references, both within and without the district; that is to say, at Charleston, and at Columbia, S. C., within the district, and at Atlanta, Ga., and at New York, N. Y., without the district. At all of the references testimony has been offered, supplemented by various exhibits, and in addition there has been filed with me testimony of one witness taken by deposition in Cincinnati, Ohio, and also certain affidavits by agreement of counsel submitted as evidence in the case. With this report there is filed a transcript of all the testimony, together with 63 exhibits in behalf of the complainant and 17 exhibits in behalf of the defendant. There is also filed to supplement this report the complete minutes of the various references, showing dates and times of holding references, counsel in attendance, witnesses heard, and exhibits filed. The references have necessarily extended over a long period of time, in view of the volume of testimony necessary to be taken and in view of the large number of parties and counsel interested, and the times and places of the hearing have been in good part arranged to suit the engagements and convenience of the various counsel engaged in the cause. Ample time and full opportunity have been given by the master to all parties to present all testimony desired, and the references were not closed until all parties had agreed that they had nothing further to offer. Full opportunity for argument has been given and briefs filed by the respective counsel.

### Statement of Issues and Facts.

As is well known, during the period of the World War, the Postmaster General, under the authority of an act of Congress, took over the telephone lines, including the lines of the Southern Bell Telephone & Telegraph Company. During this period the rates for telephone services were readjusted and raised by direction of the Postmaster General. Under the act of Congress returning the telephone lines to respective owners (41 Statutes at Large, 157), the rates so established by the Postmaster General and then in existence were directed to be continued for a period of four months unless modified or changed by the proper authorities, state, municipal, or otherwise. This act took effect and the lines were returned to their owners on July 31, 1919. On September 25, 1919,

the complainant in this case made application to the South Carolina Railroad Commission to continue such rates in force, and on December 11, 1919, the South Carolina Railroad Commission, which has jurisdiction over telephone lines in this state, made an order effective January 1, 1920, continuing the exchange rates without change and the toll rates with certain minor, immaterial changes named in the order, to continue in force until further order of the Commission.

On October 27, 1920, the complainant made another application to the Railroad Commission for a revision and increase of the rate for exchange service in South Carolina and for the abolition of certain free service between a number of its exchanges, claiming that the return on such rates was not sufficiently remunerative and that the free service above mentioned was discriminatory. After a hearing the Commission abolished the above-named free service and established a schedule of exchange rates at a higher rate than the former rate. See Exhibits C and D, attached to the bill of complaint; also, Miller v. Southern Bell Telephone & Telegraph Co. (C. C. A.) 279 F. 806. It will thus be seen that after April 1, 1921, the toll rates in South Carolina remained the same as those put into effect by the Postmaster General during the period of federal control, subject to certain modifications by the South Carolina Railroad Commission by its order of December 11, 1919, and on and after the said date the exchange rates were those authorized by the order of the Commission under date of March 24, 1921, above referred to. These are the rates that the complainant has been charging and receiving in this state since April 1, 1921. The matter of the free service between the exchanges above referred to is not an issue under the order of reference to me and will not be further considered.

By act of the General Assembly of South Carolina, approved April 3, 1922 (32 St. at Large, p. 1050), the telephone companies, including complainant, were prohibited from charging a greater price or greater rate than was of legal force and effect and on file with the Railroad Commission of South Carolina on January 1, 1921. In other words, the act of the Legislature thereby abrogated the effect of the order of the Railroad Commission of March 24, 1921, and directed that the rates charged prior to that time be again put into effect. The proceedings in this cause are brought to relieve the complainant of the provisions of this act, and it is prayed that the court declare the said act to be unconsti-

tutional, null, and void on the ground that the rates as required by the Legislature are unreasonable and confiscatory. Shortly after this act was passed and approved by the Governor, the complainant applied to the United States court of this district for an injunction, and after a hearing the court granted a temporary restraining order and thereafter referred the issues to me as heretofore set out.

The defendants appeared and answered denying the allegations as to the rates being unreasonable and confiscatory, and alleging that the American Telephone & Telegraph Company is the real party in interest, and prayed that such company be made a party. By order of the court this prayer was refused.

Throughout this case, both in testimony and in argument, frequent reference has been made to the connection of the American Telephone & Telegraph Company with the complainant, Southern Bell Telephone & Telegraph Company. It has been shown that all the stock of the complainant is owned by the American Telephone & Telegraph Company; that the complainant has a contract with the American Telephone & Telegraph Company, which will be more particularly referred to hereinafter in the question of value of the property, and allowance of the proper charges of service, etc.; and that the American Telephone & Telegraph Company also owns and operates certain toll lines in South Carolina under arrangement with the complainant. Any and all dealings between the two companies which affect the valuation of the property of the complainant in this state should be and have been carefully considered and scrutinized, and will be considered more fully hereafter.

A great deal has been said in this case as to the American Telephone & Telegraph Company being the real party in interest and being the parent company, and that its arrangement of service, rates, etc., with the complainant, are, or may be, manipulated for rate-making purposes so that it either "feeds or bleeds" the complainant as may be proper for its own purposes. It has also been claimed that the American Telephone & Telegraph Company has acquired practical control of the telephone utilities of the United States (which certainly seems to be true) and is making enormous profits, increasing its telephone rates and laying aside a large and substantial surplus. All of this may be true, and, if so, such company may be and should be regulated and restrained by proper action. However, whatever the attitude, pre-

vious attitude, or intention of the American Telephone & Telegraph Company may be, it cannot affect the findings in this case, except only so far as its contractual relations with the complainant are concerned. By order of the court the American Telephone & Telegraph Company is entirely excluded from consideration here except as above noted, and in the findings as to values, revenues, rates, etc. that fact must be kept constantly in mind. It must also be remembered that the case is purely one as to the values, revenues, rates, etc., of the complainant, Southern Bell Telephone & Telegraph Company, alone, and only as to its properties in the state of South Carolina.

### Testimony and Findings.

We now come to the consideration of the first question submitted under the order of reference, namely, as to what is the value of the complainant's property in the state of South Carolina. At the outset we find the solution of this problem somewhat complicated by the fact that the telephone equipment throughout the state of South Carolina, while mainly owned by the complainant, is in part owned and operated by the American Telephone & Telegraph Company, so far as toll lines are concerned, although operated in conjunction with the property of the complainant. It is therefore necessary in considering the value to see that such property and equipment is segregated from the property of the complainant itself.

The next fact to be noticed is that the telephone business of this state consists of exchange and toll service. Of course, the exchange service is entirely intrastate business. The toll business, however, is both intrastate and interstate. In arriving at the valuation of the property, therefore, it is necessary to divide the values of the toll property and service between intrastate and interstate, and the amount arrived at as representing the latter must be excluded from the valuation to be found here. Of course, the same thing occurs as to revenues. In addition to the foregoing division, an additional division must be made when we come to consider the charge for overhead expenses. The Southern Bell Telephone & Telegraph Company operates in several states with headquarters in Atlanta, Ga., and with subheadquarters at Charlotte, N. C., for certain purposes. It is therefore necessary in fixing the overhead to divide the charges thus incurred at these headquarter points among the various states affected so as to apportion to South Carolina its proper share.

5 F.(2d)—6

All of this division the complainant in this case has attempted to make, and has submitted voluminous testimony and exhibits setting forth its figures and subdividing the same so as to apply them fully to South Carolina and furnish a basis for finding the value as called for by the order of reference. The method to be used in such a division has been pointed out in a number of decisions by the Supreme Court of the United States. The value of the property employed in intrastate business must be ascertained and considered entirely apart from the property employed in interstate business. Such property, however, as is used jointly, must be apportioned between intrastate and interstate according to the use that is actually made of it for such respective service. Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Northern Pacific R. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; N. & W. R. Co. v. Conley, 236 U. S. 605, 35 S. Ct. 437, 59 L. Ed. 745.

At the opening hearing in this case, the complainant offered such testimony as to the value of its property as of April 1, 1922, and as the hearings continued over a considerable period of time, later by additional evidence continued its estimates of valuation, earnings, etc., down to and as of December 31, 1923. This was done in accordance with what seems to be the rule as laid down by the Supreme Court, namely, that the value should be ascertained as of the time of inquiry. San Diego, etc., Co. v. National City, 174 U. S. 739, 19 S. Ct. 80, 43 L. Ed. 1154; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Bluefield Water Works, etc., Co. v. Public Service Co., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176.

For years the matter of ascertainment of property valuation on which to determine rates for public utilities has been a troublesome and vexatious one. One method is to adopt the actual investment paid into the plant equipment, etc. Such method, however, will not account for mistakes, errors, or waste which may have taken place in the building and construction of the business, nor does it give the owner the benefit of the increase in valuation that may have accrued through time, his foresight, shrewdness, or

business ability in earlier investment, and the risk to which his capital so invested was subjected.

Another suggested method is that of present value as shown by replacement costs new less depreciation as actually existing, or estimated as nearly as can be. Objection is sometimes made to this method for the reason that a utility desiring an increase in rates might choose such time as when prices for labor and materials are excessively high and make an appraisal at that time as to the replacement of its plant. There is much to say in favor of this objection, just as the users of such utility might in like manner choose a period when excessively low prices prevailed to apply to public service commissions or courts to reduce the rates on the same basis. Of course, no system is perfect. However, it would seem that the present value as determined by replacement less depreciation is probably the nearest and fairest system that can well be adopted to arrive at present value of a public utility plant. It may well be said, in answer to the objections above urged, that when prices are high, necessarily the value of the plant is increased, and it should be earning more and its owner should receiver larger returns, and that likewise, when a period of depression has set in and prices are low, that the value of such utility should be lower and that its return should be smaller and its owners should likewise receive smaller returns just as they would and must receive from other investments whether subject or not subject to public regulation. The value of an ordinary commodity can readily be determined by ascertaining what would be the fair market price at such time. However, as to public utilities such as railroads, telephones, or telegraph systems, there cannot be found any market price, as such things are quasi monopolies and with quasi public interest. And the nearest system of finding the market price that has yet been devised would seem to be a system of value by replacement less depreciation.

The decisions of the Supreme Court and other courts in the United States have not laid down any regular rule by which such findings of value can be measured. However, starting with the case of Smyth v. Ames, supra, through a long line of decisions, they have pointed out ways for the ascertainment of value and making of rates. The most recent cases of the Supreme Court are: Missouri ex rel. S. W. Bell Tel. Co. v. Public Service Com., 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Georgia Railway & Power Co. v. R. R. Co., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Bluefield W. W. & Imp. Co. v. Public Service Com., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1177. These two latter named cases were both decided on the same day, namely, June 11, 1923. The majority opinion in the Georgia Case would seem to be somewhat conflicting with the measure of valuation of those in the others, as is carefully pointed out by Mr. Justice McKenna in his dissenting opinion. However, it seems to me that the main discrepancy between the two methods is that in the Georgia Case it is pointed out that it is not necessary that the court must absolutely follow the replacement value irrespective of anything else, but that in considering value an independent judgment must be exercised and all things affecting the value be considered. Of course, if it be shown that the proposed replacement value is based upon extreme, unusual, or absolutely abnormal costs, figures, and conditions, I take it to be the meaning of this decision that such replacement figures are not to be taken as the true measure, but that it is the duty of a court to inquire into the fairness and correctness of such replacement value, considering the time of making, method of making, and any unusual or apparent condition that may be purely temporary. In the absence of such conditions, however, it seems to me that the replacement method of value is the fairest and best that can be found, and it seems to have met with the repeated approval of the courts. In finding the value in the present case I have therefore adhered to this system, taking also into consideration the other factors deemed proper by the court in the above-named decisions. What appears to be the clearest rule to be followed is that laid down by the Supreme Court in the Bluefield Case where it is said:

" 'If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase.' Willcox v. Consolidated Gas Co. (1909) 212 U. S. 19, 41, 52, 53 L. Ed. 382, 395, 399, 48 L. R. A. (N. S.) 1134, 29 Sup. Ct. Rep. 192, 15 Ann. Cas. 1034.

" 'The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.' Minnesota Rate Cases (Simpson v. Shepard) (1913) 230 U. S. 352, 434, 57 L. Ed. 1511, 1555, 48 L. R. A. (N. S.) 1151, 33 Sup. Ct. Rep. 729, Ann. Cas. 1916A, 18.

" 'And in order to ascertain that value, the

original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property.' Smyth v. Ames, supra, 546, 547.

" ' * * * The making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law.' " Minnesota Rate Cases, supra, 454 (33 S. Ct. 729).

Following the foregoing decision, it would seem that we should consider the following facts:

(a) The original cost of construction.

(b) The amount expended in permanent improvement.

(c) The amount and value of its stocks and bonds.

(d) The present as compared with original cost of construction.

(e) The probable earning capacity under particular rates prescribed by statutes.

(f) The sum required to meet operating expenses.

(g) Other relevant matters in aid of reasonable judgment.

The original cost of construction and amount expended in permanent improvement can only be shown by the complainant's own books and accounts. At the first reference held in Atlanta, the headquarters of the company, testimony was introduced by its chief accountant, Mr. McTiernan, as to the book values of the company and what amounts were actually invested in its property in South Carolina, including both original construction and subsequent permanent additions. This consisted entirely of costs of physical property, real estate, poles, wires, switchboards, fixtures, and other physical structures and property, and also cash working capital, and excluded any estimated valuation for appreciation of any of this property or any intangibles. As first submitted, these figures, of course, cover total valuation of the investment in the state and include both exchange and toll and also both

intrastate and interstate. The subsequent division of these according to the methods heretofore outlined were made and offered in evidence so as to show the actual investment made up of original costs and permanent improvements in the state of South Carolina, covering property used in intrastate business. The defendants have criticized the figures submitted, taking the position that it was not clearly shown how such figures were arrived at. However, they have not attempted to offer any evidence in rebuttal on this point. In the absence of any conflicting evidence, there is but one course open, and that is to find according to the actual testimony submitted irrespective of any criticisms or suspicions that may be suggested as to its correctness. The testimony shows that all of the accounts of the complainant are, and necessarily must be, kept in accordance with the instructions of the Interstate Commerce Commission. These books and records are subject to constant supervision by such Commission and were available for examination and inspection by the defendants and their accountants.

From the undisputed evidence, therefore, I must find that the original cost or investment of the complainant in its property in South Carolina as of the year 1921 was $5,599,814.03, as of the year 1922, $6,505,886.45, and as of the year 1923, $6,718,416.92.

Of course, these figures must be subdivided so as to exclude such amount as is used for interstate business on the basis of use. The witness Mr. Brooks (Exhibit 43) furnished this data. Of course, all of the exchange charge is used in handling intrastate service, while the toll is used for both classes of services. From the exhibit above referred to, we find the figures subdivided so as to exclude interstate and give us the intrastate investment. The rule of division appears to be fair and as accurate as can be devised, and, in the absence of any better rule being shown, I have adopted it as the one to be used, and therefore find the amounts to be as therein set forth; that is to say, I find that the original cost and permanent improvement of the business used for intrastate business only in South Carolina to be as of the year 1921, $4,956,315.82, as of the year 1922, $5,841,429.43, and as of the year 1923, $6,025,090.70.

The complainant in this case is engaged in business in some nine states and is capitalized as a whole without any subdivisions as to particular states, nor does it issue bonds based upon a particular class of business or upon its property in any state or subdivision.

I have had no data submitted to me by which I could arrive at any capitalization or bond issue as applied to South Carolina. As neither of the parties to this cause has furnished any evidence as to this that would be of assistance in determining the issues before me, a consideration of capital and bond issue would be profitless and of no use and is, therefore, not used as a basis in the conclusions herein found.

We next come to the consideration of what the Supreme Court (Bluefield Case, supra) speaks of as "the present as compared with the original cost of construction," in other words, what has heretofore been referred to and is often spoken of as present replacement valuation, that is to say, the cost of the equipment and reconstruction of a plant such as the complainant now has less depreciation, so as to arrive at the real true valuation of the plant at the present time.

The complainant has submitted evidence as to the value of its lands and buildings (see testimony and exhibits of witnesses Krebs and Marye and affidavits of real estate appraisers). The principal evidence of the complainant, however, as to the valuation of the reconstruction of the telephone, plant, exchanges, and other property in the state of South Carolina, is furnished by the very voluminous and elaborate inventory and appraisal made by the witness E. F. Brown, the complainant's engineer. It appears that Mr. Brown was assisted by some 160 men, working under his immediate supervision and control gathering data by actual inspection and testing of the physical property itself throughout all of its lines in this state. This appraisal, according to the testimony of Mr. Brown, was arrived at by first making an inventory of each item and article in the South Carolina plant; second, by determining what it would cost to replace such property new at prices and conditions as of April 1, 1922; third, by determining the amount of depreciation then existing on the property at the time of the inventory; fourth, by determining the use of the property between exchange and toll; and, fifth, by determining the actual reproduction costs of the property in its present condition, that is to say, taking the reproduction cost new and deducting the depreciation so as to find its present reproduction costs.

The testimony of the witness is quite voluminous and is illustrated by a number of exhibits all of which are in evidence and submitted with this report. The summary of the findings of this witness as of April 1, 1922, is as follows:

**Physical Property.**

| | |
|---|---:|
| Pole lines | $1,491,843 |
| Aerial cable | 696,047 |
| Aerial wire | 994,036 |
| Aerial wire-drops | 113,943 |
| Right of way | 93,114 |
| Underground conduit | 388,109 |
| Underground cable | 337,268 |
| Submarine cable | 26,041 |
| Central office equipment | 1,502,086 |
| Other equipment of central offices | 57,966 |
| Substation apparatus | 387,316 |
| Substation installation | 105,854 |
| Interior block wire | 12,060 |
| Private branch exchanges | 63,672 |
| Booths and special fittings | 39,260 |
| Real estate—buildings | 493,252 |
| Real estate—land | 195,866 |
| Office furniture and fixtures | 32,468 |
| Tools, teams, motor vehicles | 57,144 |
| | |
| Subtotal | $7,087,345 |
| Interest during construction | 320,285 |
| | |
| Total cost of plant | $7,407,630 |

**Working Capital.**

| | |
|---|---:|
| Cash | 91,486 |
| Supplies | 101,937 |

**Going Concern Value.**

| | |
|---|---:|
| Cost of making going concern with organized forces and attached business | 815,000 |
| | |
| Total reproduction cost new | $8,416,053 |

The total reproduction cost new is then apportioned, on the basis of use, to exchange service and toll service, and the depreciation of each item of physical property, except rights of way and lands, being ascertained, the aggregate depreciation is subtracted from the reproduction cost new, and thus is shown the witness' estimate of actual reproduction cost of plant as of April 1, 1922, subdivided between exchange service and toll service. This testimony gives the reproduction cost (April 1, 1922 condition) of the South Carolina property as exchange, $4,931,572, and toll, $2,779,730. At a later reference a similar summary was introduced by the same witness bringing reproduction cost to December 31, 1923 (Brown Exhibit 61); this gives the reproduction cost to be exchange, $5,127,105, toll, $2,846,691.

A considerable volume of testimony has been introduced in this case as to proper method of arriving at depreciation. Witnesses on both sides have testified as to methods of determining depreciation and as to the propriety of the curved line or the straight line method of determining depreciation. These methods are of great value when based on experience over a large number of years, and are useful in determining what may be expected in the way of depreciation in the future. It is usually not fea-

sible to have an actual inspection of all the property of a plant and thus determine the actual depreciation as of the time, of the inspection, and therefore some such determination of depreciation is usually necessarily adopted. To my mind, however, no system can be devised to arrive at the actual depreciation of a plant on any given date that could possibly be as accurate as the actual physical personal inspection of each and every structure and part of a plant. If one wishes to arrive at the actual value and in order to determine the actual depreciation that exists on any piece of property, say a locomotive engine, it is certainly much more exact and satisfactory to have an actual examination of each part of the make-up of the engine itself rather than to rely upon a theoretical schedule of depreciation based upon the experience of the depreciation of such engines for a number of years. It is true that in order to arrive at what would probably be the depreciation of a number of engines over a period of years in use, the theoretical system of arriving at depreciation would necessarily have to be used. But in the instance of one individual engine in the hypothetical case here considered, the actual physical examination would be exact as reflecting the condition of the individual piece of property rather than what ought to be its condition according to the law of average.

The complainant in this case has offered evidence based upon actual physical examination and appraisal of valuation and depreciation. I am of the opinion that this is the best evidence that could be obtained, provided only that the work was done in good faith, accurately, intelligently, and by persons who were capable and knew their business. To substantiate the testimony of Mr. Brown and his associates, the complainant in its reply testimony offered corroborating testimony by the witness George Wrigley, who made what was called "a spot check." That is to say, he arbitrarily and without designation by or knowledge of the complainant's engineers selected certain portions of the complainant's property, made a physical examination, and reported on such. In contradiction of the testimony of Mr. Brown, defendant offered testimony of Mr. Lathrop, who examined certain of the property of the complainant, and offered what is also substantially a "spot check," and in addition the defendant offered certain evidence as to value of common labor, costs of constructing manholes and value, conditions and depreciation of poles and pole lines.

In the recent case of Pacific Gas & Electric Co. v. City and County of San Francisco, decided by the Supreme Court of the United States on June 2, 1924 (265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075), considering the question of depreciation, that court, by Mr. Justice McReynolds, says: "Facts shown by reliable evidence were preferable to averages based upon assumed probabilities."

In making his estimates, the appraisal engineer was guided not only by his engineering experience in making other appraisals, but also by his actual experience in connection with the construction in recent years of telephone plant property aggregating in value approximately six and a half million dollars.

Considerable testimony as to labor costs in South Carolina covering the past several years was introduced by defendants. When considered, however, there is no substantial variance between the testimony of complainant and defendants as of the time of the appraisal which was April 1, 1922.

The complainant engaged the services of the engineering firm of J. E. Sirrine & Co. of Greenville, S. C., who were asked to make an independent investigation of both the inventory and appraisal as made and submitted to the court. As above noted, Mr. George Wrigley, a member of this firm, and his assistants, undertook this work, and made a "spot check" of both the inventory and appraisal. The result arrived at by this concern, and as testified to by Mr. Wrigley, was corroborative of complainant's witnesses. This investigation showed the correctness of the inventory, and demonstrated that the unit costs of both material and labor as testified to by complainant was fair, reasonable, and accurate.

As above stated, the result of the appraisal shows the reproduction cost of all the property in South Carolina in present condition, that is, after the depreciation has been deducted, to be as of April 1, 1922, $7,711,302, and as of December 31, 1923, $7,973,696. The company's chief accountant, Mr. McTiernan, has determined on the basis of use by the method hereinabove referred to, the portion of this property, exclusively employed in furnishing intrastate service, the result being the reproduction cost in present condition of the intrastate property as of April 1, 1922, $6,920,830.65, and as of December 31, 1923, $7,158,403.70.

The probable earning capacity of complainant's property in South Carolina is dependent upon several matters, namely,

whether or not there is the need and demand for service in the state, and whether such demand will continue and increase, and in that connection the question arises whether or not complainant's property throughout South Carolina is capable of, and in fact is, supplying the demand, and this involves the question whether or not the property is so engineered and constructed that it may be economically enlarged and operated to supply the increasing demand with its growing business, as well as the policy and condition of the complainant being such as to assure that it will continue to supply the demand by furnishing adequate and sufficient facilities and services, and likewise is the property within South Carolina such that the particular rates which will be profitable to the subscribers also be profitable to the complainant.

From all the testimony it is apparent that there is both a growing need and a demand for the telephone service of complainant throughout this state. It also appears to be true from the testimony that the plant and facilities of the company within this state have been well engineered and are adequate for the present as well as adaptable to the growing needs of the state, and that the policy and condition of the company is such as will assure that the demand will be supplied.

The complainant has shown in detail the operating expenses which it has incurred during the past three years. Much testimony has been offered to show that these expenses were reasonable and necessary. The only items which were seriously disputed were the payment of 4½ per cent. of certain revenues to the American Telephone & Telegraph Company for services received by complainant from said American Telephone & Telegraph Company, and the amount paid by complainant to the Western Electric Company, being the purchase price of materials; and the amount of the annual contribution to the depreciation reserve.

Under the contract in evidence between the complainant and the American Telephone & Telegraph Company, complainant pays annually to the American Telephone & Telegraph Company 4½ per cent. of its gross income, and such payment is deducted as a part of the operating expenses. The American Telephone & Telegraph Company owns substantially all of the stock of the complainant, and this fact affords the ground for defendant's attack. From the American Telephone & Telegraph Company the complainant leases its instruments, secures their maintenance and renewal, and in addition ac-

quires many other things of value in the operation of its business; these being set forth in detail by Mr. Jagoe in Exhibit 39, in which it is shown that the savings effected annually by reason of the contract are much in excess of the 4½ per cent. This testimony given by one of complainant's officers is corroborated by that of Mr. Moran, the president of the Southern New England Telephone Company, and Mr. McBurney, vice president and general manager of the Cincinnati & Suburban Telephone & Telegraph Company, neither of which companies is owned by the American Telephone & Telegraph Company, and both of which operate under an identical contract with that company.

The testimony of the defendants to the contrary is meager and unsatisfactory; in fact, there is little testimony except opinion and argument. There is of course, no doubt that the close connection of the two corporations, one owning all of the stock of the other, necessarily immediately arouses a certain suspicion as to the terms of their mutual contracts. However, a court cannot set up suspicion against direct testimony. The companies with which the witnesses Moran and McBurney are connected are not owned or controlled by the American Telephone & Telegraph Company. They have similar 4½ per cent. contracts, and both witnesses testify strongly in behalf of the value of the same to their respective companies. Under these circumstances, the testimony offered by the complainant must prevail.

But there are more reasons why the contract should be found to be satisfactory. Identical contracts have been considered by the Supreme Court of the United States recently in Houston v. Southwestern Bell Tel. Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961, and Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807, and have been approved in both instances. In the latter case, the court declared that there was nothing in the contract to indicate bad faith; that "it must never be forgotten that while the state may regulate with a view to enforce reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership," and further that the court cannot "ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers."

No abuse of discretion on the part of the

corporate officers has been shown by the defendants in this case. Hence the case is controlled by the two decisions cited, and the sums paid out under the contract must be held to be proper operating expenses.

The operations of complainant under the contract with the Western Electric Company, which is also largely owned by the American Telephone & Telegraph Company, have been detailed at length in the testimony of witnesses in the service of complainant. That the prices charged are fair and reasonable, and in fact more favorable to complainant than if it had to buy all of its supplies in the open market, seems to be established by the testimony both of witnesses in complainant's employ and of others who have no connection with complainant.

Aside from this, defendants make absolutely no showing either of bad faith or of abuse of discretion on the part of complainant's officers in regard to this contract. The contract, therefore, is approved under the decisions of the Supreme Court cited above.

With reference to the item of depreciation reserve it appears that the Interstate Commerce Commission not only has prescribed this charge and the manner in which it shall be ascertained, but in addition has directed it to be continued until otherwise ordered. That the amount of the charge is correct is sustained by the testimony of Mr. Jagoe, who based his conclusions on the actual experience of the company covering a period of 17 years. I therefore conclude that the charge is proper and the amount thereof is correct for each of the years involved.

From what has been said it necessarily follows that the operating cost, as shown by complainant in the statements based upon its books and property, correctly represents the sum required to meet operating expenses.

### Conclusion as to Value.

There has been abundant testimony offered by both parties showing that there have been substantial increases in costs between the time when the property was originally constructed and the present time. This appreciation in cost seems to be measured very accurately by the difference between the original cost as shown by complainant's books of record and the present cost of construction as shown by the inventory of Brown and corroborated by Wrigley.

Among the things included in such appreciation would be the difference between cost of construction as of its date and the present, and also the going concern value. In his appraisal, the engineer has fixed this going concern value at $815,000, or 9.67 per cent. of the reproduction cost new, which would seem to be justified under the decisions in Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371; Omaha v. Omaha Water Co., 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Denver v. Denver Union Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649; Bluefield Water Works, etc., Co. v. Public Service Com., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Minneapolis v. Rand (C. C. A.) 285 F. 818; Pacific Gas, etc., Co. v. San Francisco (D. C.) 273 F. 937; Des Moines Gas Co. v. Des Moines (D. C.) 199 F. 204; Des Moines Water Co. v. Des Moines (C. C.) 192 F. 193; Venner v. Urbana Waterworks (C. C.) 174 F. 348; National Waterworks v. Kansas City, 62 F. 853, 10 C. C. A. 653, 27 L. R. A. 827; S. W. Bell Tel. Co. v. Fort Smith (D. C.) 294 F. 102; Mobile Gas Co. v. Patterson (D. C.) 293 F. 208.

After full consideration, therefore, of the original cost, the present cost of construction, the probable earning capacity of the property, the sum required to meet operating expenses, and other relevant matters needful to be regarded in forming a sound judgment, I have reached the conclusion that, under all the circumstances, the value of the property of the complainant, Southern Bell Telephone & Telegraph Company, in the state of South Carolina, is shown by the testimony adduced by it and heretofore discussed. Under the decisions it would seem that the value should be fixed as of the date of the inquiry. The nearest date on which there is available evidence is December 31, 1923. The testimony shows the value as of such date to be somewhat in excess of $7,000,000. Even from one day to another values will fluctuate a few dollars. I have, therefore, in order to be on the safe side and allow for some errors or changes, adopted a figure somewhat less than that of the actual testimony, and so fix the value at $7,000,000.

### What Is the Gross Income of the Complainant?

The testimony of Mr. McTiernan, based on the books of the company, shows its gross income, derived from intrastate business exclusively, to be for the year 1921, $1,799,-830.05 (Exhibit 45), for the year 1922, $1,-872,208.53 (Exhibit 44), and for the year 1923, $1,996,865.84 (Exhibit 54); these amounts having been earned by operations

under the rates prescribed by the Commission in its order No. 229 of March 24, 1921.

As there is nothing to the contrary, I conclude that these figures correctly represent the gross income actually earned under the rates that have been in effect.

## What Should Under All the Circumstances be Complainant's Net Income?

The company's chief accountant, Mr. McTiernan, prepared from its books and introduced in evidence statements showing the operations for the years 1921, 1922, and 1923; these statements being explained in detail by him in his oral testimony. From these it appears that the total operating costs from the intrastate service for the year 1921 was $1,663,096.92 (Exhibit 45), for the year 1922 was $1,648,666.30 (Exhibit 44), and for the year 1923 was $1,620,573.77 (Exhibit 54).

From the same testimony and exhibits it appears that the net intrastate revenue of complainant for the year 1921 was $136,733.13 (Exhibit 45); for the year 1922 was $223,542.23, or a net return at the rate of 3.83 per cent. on the intrastate investment (Exhibit 44), and 3.19 per cent. on a valuation of $7,000,000; and for the year 1923 was $376,292.07, or a net return at the rate of 6.25 per cent. on the intrastate investment (Exhibit 54), and 5.38 per cent. on a valuation of $7,000,000. The above figures show the returns earned from the rates prescribed by the order of the Railroad Commission of March 24, 1921, and are rates that have been continued in force by this court under the injunction issued in this cause.

In a similar manner, complainant also offered evidence (Exhibit 56) as to what would have been earned from intrastate operations during the same three years if the rates prescribed by the statute, the subject-matter of this action, had been effective. From this it appears that the year 1921 would have shown, instead of a net revenue, a deficit of $41,348.62; the year 1922 would have shown a net revenue of $31,308.48, or a net return at the rate of 0.54 per cent. on the intrastate investment, and of 0.447 per cent. on a valuation of $7,000,000; and the year 1923 would have shown a net revenue of $149,007.41, or a net return at the rate of 2.47 per cent. on the intrastate investment and of 2.13 per cent. on a valuation of $7,000,000.

Unless clearly confiscatory on their face, it is usually necessary to allow a period for testing a schedule of rates in order to prove their effect. Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034.

But under the decisions, a period of three years is more than sufficient for this purpose. Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Rowland v. St. Louis, etc., Co., 244 U. S. 106, 37 S. Ct. 577, 61 L. Ed. 1022; Newton v. Consolidated Gas Co., 258 U. S. 165, 42 S. Ct. 264, 66 L. Ed. 539.

There has been no contrary showing, and the chief accountant's statement based on the books as to the expenses, the net revenues under the rates in effect, and the net revenues that would have resulted from an application of the legislative rates, for each of the three years, must be held correct; and I so find.

As I have found, the rates that have been charged under the injunction have yielded for 1923 a net income of 6.25 per cent. on the investment cost of $6,025,090.70, and of 5.23 per cent. on a valuation of $7,000,000, while the legislative rates which have been enjoined would have yielded a net income of 2.47 per cent. and 2.13 per cent. respectively, on the same basis.

In its latest case, Bluefield Waterworks, etc., Co. v. Public Service Com., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176, the Supreme Court has this to say concerning the rate of return:

"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures."

It then proceeds to hold a rate of 6 per cent. upon the value of the property "too low to constitute just compensation for the use of the property employed to render the service."

In Brush Electric Co. v. Galveston, 262 U. S. 443, 43 S. Ct. 606, 62 L. Ed. 1076, the Supreme Court affirmed the ruling of the lower court which fixed 8 per cent. upon the value of the property as the proper rate of net income.

In Lincoln Gas, etc., Co. v. Lincoln, 250

U. S. 256, 39 S. Ct. 454, 63 L. Ed. 968, the court declined, on the facts of that case, to approve a finding that no rate yielding as much as 6 per cent. on the invested capital could be regarded as confiscatory, when the undisputed evidence showed that 8 per cent. was the lowest rate sought and generally obtained as a return on capital invested in banking, merchandising, and other business in the vicinity, and that 7 per cent. was the legal rate of interest in Nebraska.

In Minneapolis v. Rand (C. C. A.) 285 F. 818, 7½ per cent. on the value of the property was allowed.

In Mobile Gas Co. v. Patterson (D. C.) 293 F. 208, 8 per cent. upon the property used and useful in furnishing the service was declared to be the proper return.

In Southwestern Bell Tel. Co. v. City of Fort Smith (D. C.) 294 F. 102, 8 per cent. was admitted by the city as a proper return.

In N. Y. Tel. Co. v. Prendergast, 300 F. 825, recently decided in the Southern District of New York (Hough, C. J., Knox and Winslow, D. J. J.), the court says:

"The rate of return on property is a matter of custom, and custom is fundamentally opinion. Admittedly it is and has been customary to allow as a reasonable rate of return for regulated businesses like this one— 8 per cent. The justification for the custom is the habit of business men, and a departure therefrom is not right because a court or commission prefers a lower rate."

By the statute law of this state, the legal rate of interest is fixed at 7 per cent. with 8 per cent. allowable by special contract. The evidence satisfied me, and in fact it is a matter of common knowledge that capital invested in South Carolina in banking, merchandising, and other businesses yields a rate of 8 per cent. Under the decisions above cited, a public utility company is not expected to earn a less return on the value of its property used and useful in rendering the public service.

I therefore find that, under all the facts and circumstances of this case, the complainant's net income should be 8 per cent. upon the value of its property devoted to the public service in this state.

### General Conclusions.

To summarize what has been heretofore said, I find:

1. The value of the complainant's property devoted exclusively to its intrastate business in South Carolina to be $7,000,000.

2. Its gross income for 1923 under the rates that have been in effect to be $1,996,865.84.

3. The proper net income should be 8 per cent. upon the valuation of $7,000,000, or $560,000. The actual net income during the year 1923 was $376,292.07, or 5.38 per cent.

Grier & Park, of Greenwood, S. C., W. S. Nelson, of Columbia, S. C., Hagood, Rivers & Young, of Charleston, S. C., Henry E. Davis, of Florence, S. C., and Hunt Chipley, of Atlanta, Ga., for plaintiff.

Saml. M. Wolfe, Atty. Gen., John M. Daniel, Asst. Atty. Gen., Frank A. Miller, of Hartsville, S. C., and D. W. Robinson, of Columbia, S. C., for defendant.

ERNEST F. COCHRAN, District Judge. An order of the Railroad Commission of South Carolina dated March 24, 1921, prescribed certain telephone rates, effective from and after April 1, 1921. This order materially increased the existing rates. The General Assembly of South Carolina, by an act approved April 3, 1922, provided that no greater rates should be charged than were of legal force and effect and on file with the Railroad Commission on January 1, 1921. The effect of the act was to abrogate the order of the Commission of March 24, 1922, and restore the previous rates and deprive the plaintiff of the increase provided by that order. The plaintiff brought its action to enjoin the enforcement of the act of the General Assembly approved April 3, 1922, on the ground that it was unconstitutional in that the rates restored by that act were unreasonably low and confiscatory and deprived the plaintiff of its property without due process of law. The defendants denied that the rates were unreasonably low and confiscatory. The case was referred to a special master to take the testimony and report the same. The order of reference also provided as follows:

"That the special master shall report to the court his conclusions and recommendations as to (A) what is the value of the complainant's property in this state, and (B) what is the gross income of the complainant, and (C) what should under all circumstances be its net income, and for that purpose, in making up the statement to show the same, said special master is authorized, in order to ascertain the same, to pass upon the proper application and entries under the law and the testimony of all receipts and disbursements; subject to the supervision and conclusions of the court."

The special master has filed his report. The defendants have filed their exceptions to this report, 16 in number. The plaintiff has filed no exceptions. The case was heard by the court on December 17, 1924. At the hearing the case was argued orally, and both sides have filed printed briefs, and the case is now before this court for final decision on the merits.

[1, 2] At the threshold we are met with opposing views as to the manner in which this court should consider and determine the case. The plaintiff contends that the findings of the master are prima facie correct, the presumptions in their favor, and they should not be overruled unless manifestly wrong, and, while conceding that before the master the plaintiff carried the burden of proof, contends that now upon the exceptions to the report the burden is, upon the defendants to show from the evidence that the findings of fact are erroneous in the respects charged in the exceptions. The defendants contend that the exceptions practically cover the whole case, that a review of the evidence shows that the plaintiff has not met the burden upon it of showing that the rates are unreasonable and confiscatory, and that the parties are entitled (quoting from defendants' brief) "to the benefit of the independent judgment of the court as to both law and facts."

There is much to be said in favor of the plaintiff's contention, and indeed the cases sustain that point of view as a general rule. Crawford v. Neal, 144 U. S. 585, 596, 12 S. Ct. 759, 36 L. Ed. 552; Camden v. Stuart, 144 U. S. 104, 12 S. Ct. 585, 36 L. Ed. 363; Davis v. Schwartz, 155 U. S. 631, 636, 15 S. Ct. 237, 39 L. Ed. 289; Girard, etc., v. Cooper, 162 U. S. 529, 538, 16 S. Ct. 879, 40 L. Ed. 1062.

But in this case the exceptions cover practically the whole case on the merits, so far as the facts are concerned. The case is an extremely important one, both to the plaintiff and the people of the state. It involves the question of whether or not an act of the lawmaking body of the state is to be declared in contravention of the Constitution, always a matter of great delicacy. Courts are especially reluctant to declare acts of the Legislature unconstitutional when the alleged unconstitutionality rests upon facts. Such acts will not be declared unconstitutional unless the question is free from doubt, and where dependent upon a certain state of facts the proof of the facts should be clear and convincing. The use of the telephone as a means of communication has become an important part of the life of the people, probably equaling, if not surpassing, in importance the telegraph and the postal service. In every aspect the matter is one of grave concern. Therefore, without committing the court to a similar course in such cases arising hereafter upon exceptions to the master's report, in this case I have adopted the view of the defendants on this point and have studied and considered the case independently and apart from any presumptions in favor of the master's report. In order therefore to properly exercise my independent judgment and arrive at my own conclusions upon the facts of the case, I have read the pleadings and the testimony, and I have examined and considered the various exhibits in evidence, for a proper understanding and consideration of the testimony. I have also read (more than once) and studied carefully the able briefs filed by the attorneys on both sides. I have read all of the pertinent decisions cited in the briefs. I have given special consideration to those parts of the testimony indicated in the briefs. Upon a full consideration of the whole matter, and laying aside for the present any presumption in favor of the correctness of the master's report upon the facts, I have reached the same conclusions that he reached. The facts as found by the master are amply sustained by the evidence. The rates of January 1, 1921, prescribed by the act of the Legislature are unreasonable and confiscatory and amount to a taking of plaintiff's property without due process of law, and the act is therefore unconstitutional, null, and void, in so far as the plaintiff is concerned. The evidence is clear and convincing, and I have no reasonable doubt about it. Having reached this conclusion, I might well stop here, and refrain from any discussion of the facts or the law, inasmuch as the able report of the skilled and experienced master discusses the questions involved clearly, comprehensively, and succinctly. But in view of the nature of the case and the very earnest and full presentation of the matter by defendants' attorney, I will as briefly as possible discuss the more important features of the case.

[3-7] The general principles covering such cases are fairly well settled—the main difficulty lies in their application. The courts have no power to make rates. The Legislature, in order to guard the public from exorbitant rates on the part of public utilities, has the power either by legislative act, or acting through other agencies, such as the Railroad Commission of this state, to

fix reasonable rates; but the Legislature cannot fix rates so unreasonably low as to amount to confiscation. If the rates are confiscatory, there is a taking of property without due process of law within the meaning of the Constitution, and an act of the Legislature fixing rates of such a character is therefore in violation of the Constitution and null and void. However, the rates fixed by the Legislature are presumptively reasonable, and the burden is upon the plaintiff in this case to show that they are so unreasonably low as to be confiscatory, and the evidence relied on should be clear and convincing. In Smyth v. Ames, the Supreme Court said:

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth." Smyth v. Ames, 169 U. S. 546, 547, 18 S. Ct. 434, 42 L. Ed. 819. See also Minnesota Rate Cases, 230 U. S. 434, 435, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.)1151, Ann. Cas. 1916C, 18; Bluefield, etc., v. Public Service Commission, 262 U. S. 679, 690, 691, 43 S. Ct. 675, 67 L. Ed. 1176.

[8] The value of the property employed in intrastate business must be ascertained and considered entirely apart from the property employed in interstate business. Such property, however, as is used jointly, must be apportioned between intrastate and interstate according to the use that is actually made of it for such intended service. Smyth v. Ames, supra; Minnesota Rate Cases, supra.

[9] "What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public." Minnesota Rate Cases, supra, 434 (33 S. Ct. 754); San Diego, etc., v. National City, etc., 174 U. S. 757, 19 S. Ct. 804, 43 L. Ed. 1154; San Diego, etc., v. Jasper, 189 U. S. 439, 23 S. Ct. 571, 47 L. Ed. 892; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Bluefield, etc., v. Public Service Commission, supra, 690 (43 S. Ct. 675).

"The making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law." Minnesota Rate Cases, supra, 454 (33 S. Ct. 762); Bluefield, etc., v. Public Service Commission, supra, 691 (43 S. Ct. 675).

"If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase." Bluefield, etc., v. Public Service Commission, supra, 690 (43 S. Ct. 678); Willcox v. Consolidated Gas Co., supra, 19, 41, 52 (29 S. Ct. 192).

[10] "The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." Bluefield, etc., v. Public Service Commission, supra, 690 (43 S. Ct. 678); Minnesota Rate Cases, supra, 434 (33 S. Ct. 729).

The evidence in behalf of the plaintiff fully meets the requirements of the foregoing decisions. The defendants offered testimony in rebuttal of the testimony of the plaintiff, and they rely to a great extent on the testimony of their expert witness. For the most part, however, the testimony of their expert consisted of criticisms of the methods adopted by the plaintiff's experts in arriving at the present value of the property, and these criticisms and objections will be the subject of brief discussion later. There was some conflict in the testimony upon the facts, but the weight of the evidence is in favor of the plaintiff.

The main objection presented by the defendants to the case as made out by the evidence of the plaintiff may be broadly stated as based on the alleged insufficiency of the evidence in certain particulars. The criti-

cisms or objections to the sufficiency of the case as made out by the evidence are contained in the exception to the master's report and are stated more in detail but grouped logically and comprehensively in the brief filed by their attorney.

[11] Before discussing these grounds of objections, there is one question presented by the defendants' exceptions that should be first disposed of. The defendants charge that the master found both law and facts; whereas, under the order of reference he should have reported only his conclusions of fact. I do not consider the report of the master as intended to present conclusions of the law of the case generally, as in cases where issues both of law and fact are referred. The master was required to find "the value of the complainant's property in this state." The courts have laid down certain rules as to how that value should be ascertained. The master cited some of the various decisions and stated certain conclusions of law merely to show clearly how he arrived at his conclusions of fact. There was no error in this. In addition to this, however, the defendants have not pointed out any error in the statements of law in the master's report, nor has the court been able to find any. There is no force in this objection.

[12] One of defendants' main objections is that the plaintiff's property upon which, under the Constitution, it is entitled to a fair return, is capital honestly and prudently invested, and not the value of the property at the time of the inquiry. It needs but slight consideration of the subject to come to the conclusion that any rule which may be adopted to ascertain the value of the property of public utilities or the rate base for the purpose of fixing reasonable rates encounters grave difficulties in its application. There is much to be said for the adoption of capital honestly and prudently invested as the basis. The reasons for the adoption of this basis and the difficulties attending the application of the present value rule are strongly set forth in the dissenting opinion of Mr. Justice Brandeis (concurred in by Mr. Justice Holmes) in State of Missouri ex rel. Southwestern Telegraph Co. v. Public Service Com. of Missouri, 262 U. S. 276, 289, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; but the majority of the court were of the contrary opinion. In none of the line of cases beginning with Smyth v. Ames, decided in 1898, and ending with Ohio Utilities Co. v. Public Utilities Commission of Ohio, 45 S. Ct. 259, 69 L. Ed. ——, decided March 2, 1925, did the Supreme Court adopt the rule of capital honestly and prudently invested as a rate basis, but, on the contrary, held to the rule of value at the time of the inquiry as the correct basis. Smyth v. Ames, supra; San Diego, etc., v. National City, 174 U. S. 757, 19 S. Ct. 80, 43 L. Ed. 1154; San Diego etc., v. Jasper, supra, 443 (23 S. Ct. 571); Willcox, etc., v. Consolidated Gas Co., supra; Minnesota Rate Cases, supra; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244; Denver v. Denver Union Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649; Houston v. Southwestern Telephone Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961; Southwestern Bell Tel. Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Georgia Railway v. Railroad Commission, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Bluefield, etc., v. Public Service Commission, supra; Pacific Gas v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075; Ohio Utilities Co. v. Public Utilities Commission of Ohio (No. 210, March 2, 1925) 45 S. Ct. 259, 69 L. Ed. ——. See, also, Northern Pac., etc., v. Dept. Pub. Wks., etc., 45 S. Ct. 196, 69 L. Ed. ——.

Therefore defendants' contention that a fair return should be allowed only on capital honestly and prudently invested must be overruled.

[13] Another of defendants' objections is that there is no satisfactory evidence of the actual original cost of plaintiff's property. In the defendants' brief this cost is spoken of as "actual cost" and also as "true historical cost." I am not certain whether the defendants used the terms "actual cost" and "true historical cost" as synonymous or not. So far as the actual original cost of the property is concerned, the evidence is ample and shows fully just what that cost was, and the master's finding of original or actual cost is fully supported. But in the dissenting opinion of Mr. Justice Brandeis in Southwestern Tel. Co. v. Public Service Commission, supra, in note 6, subd. (d), it is stated that the original cost is the amount actually paid to establish the utility and should be ascertained by inspection of books and vouchers and other direct evidence, and that in determining the actual cost there is no attempt to determine whether the expenditure was wise or foolish, or whether it was useful or wasteful; but that historical cost, on the other hand, is the amount which normally should have been paid for the property, and is in effect what is termed prudent investment. If the defend-

ants by their objection mean that there is no satisfactory proof of the "historical cost" in the sense just mentioned, then the question simply reverts to the question of whether the rate should be on the basis of prudent investment, and that question I have already disposed of. Inasmuch as there was ample evidence to show the original actual cost of the property to the plaintiff, this objection must be overruled.

One attack that the defendants make upon the case of the plaintiff is upon the ground that the conclusions as to the total reproduction cost new of the physical property of the plaintiff is based upon exaggerated, inflated, and untrue cost units at a time when prices were not normal. In other words, the defendants contend that the showing made as to the cost of reproducing the property new is insufficient, because, as they allege, the foundation is what is termed "unit cost" and this unit cost is alleged to be based upon incorrect or excessive or abnormal prices. The defendants in their brief set forth many specifications of error both as to the methods and as to the actual facts in the ascertainment of the cost units and the actual cost of reproducing the property new. It would unnecessarily expand this decree to discuss them all in detail, but the main grounds will be adverted to.

One ground under this head is that the unit costs were based on the inflated prices of 1918, 1919, and 1920. I quote from defendants' brief as follows:

"We respectfully submit that to allow public utilities to base their valuation for rate-making purposes on the enhanced cost of construction as it stood in 1918, 1919, and 1920, would be to require the public to guarantee or insure public utilities a fair income under abnormal conditions and based upon abnormal conditions."

The evidence does not sustain the defendants in this contention. The evidence shows that prices rose during the war and afterwards, especially during 1918, 1919, and 1920. The peak was reached in 1920, and thereafter there was a decline, and in 1922 and 1923 the bottom was reached, and thereafter there was some increase. The evidence further shows that the unit costs and prices and reproduction new cost were based on the prices and values of April 1, 1922, the time the plaintiff undertook its appraisal, and the appraisal was brought down to December 31, 1923, the latter date being the latest practicable date to close the appraisal so as to conform to the rule that the value of the property should be ascertained at the time

of the inquiry, and at that time, according to the testimony, there had been no material changes in labor or material costs from those prevailing in 1922.

[14] The defendants say, however, that in making this appraisal of 1922 and 1923 the plaintiff's experts used certain "estimates" or "studies" of work in previous years, and that therefore all unit costs must be incorrect because based in part at least upon the previous "estimates" or "studies." But the evidence shows that while previous "estimates" or "studies" were considered in a certain sense, nevertheless they were all either finally eliminated, their use explained so as to show that their use would not produce an incorrect result, or they were used simply to obtain the "productive hours" or "man hours" in arriving at the cost of reproduction. While certain of the "estimates" or "studies" were used in considering the "productive hours" or "man hours" of labor, the evidence shows that the prices used were those of 1922 and 1923. The defendants further say, however, that the previous "estimates" or "studies" should not have been used, because at the time they were made labor was very inefficient, and therefore they would furnish no safe guide. But the evidence shows that in whatever use was made of such previous "estimates" or "studies," due allowance was made for that fact and all abnormalities. It must be borne in mind that we are now dealing with the testimony of experts who have made a study of labor and labor conditions. There is nothing before the court to show that such witnesses are not honest or trustworthy, and there is no reason to suspect them of dealing unfairly with the court. They say in substance that while certain "estimates" or "studies" were considered, nevertheless they made due allowance for the conditions under which such "studies" or "estimates" were made. An expert on labor conditions may take into consideration a broad extent of territory and a long period of time. The greater his range, both in point of territory and time, the greater the value of his opinions, provided he makes due allowance for differences in conditions both as regards time and locality, when he makes his deductions and arrives at his conclusions as to labor efficiency and productivity at a particular time and in a particular locality. This the witnesses say they have done, and I find nothing in the evidence to warrant discrediting their testimony.

Among other specifications of alleged exaggerated costs, the defendants lay much

stress on the cost of these manholes as testified to by the plaintiff's witnesses when contrasted with the testimony of defendants' witnesses. While there is some conflict in the testimony, there is no great difficulty in reconciling the testimony of the various witnesses on this point. It appears that sewer manholes are of a different type and construction from telephone manholes; and, indeed, that there are different types of telephone manholes. The plaintiff's witnesses all testify as to telephone manholes and were familiar with their specifications. Defendants' witnesses (with one exception) were testifying about sewer manholes, and were not familiar with the specifications for telephone manholes. Only one of defendants' witnesses testified that he was familiar with the specifications of telephone manholes, but he was familiar only with those telephone manholes constructed in 1912, and said he did not know what the specifications were for those constructed since 1912. Moreover, his testimony related to the cost of manholes in one city only. He had had experience in constructing manholes for the telephone company in Columbia, but he only laid the brick. The company furnished everything. While his estimate of the cost of constructing manholes in the city of Columbia was lower than the estimates of plaintiff's witnesses as to the cost of manholes there and elsewhere, nevertheless I do not think his testimony sufficiently clear to overthrow the testimony of the witnesses for the plaintiff, who were men of large experience and testified positively. I think the weight of the testimony on the cost of reproducing the manholes is with the plaintiff, and I so find.

[15] The defendants also contend that there is no sufficient showing by plaintiff's experts of the manner in which certain operating expenses, which were incurred for the benefit of the whole plant in the several states in which plaintiff operates, were divided so as to arrive at the proper amount which should be apportioned to South Carolina. The testimony shows that the apportionment or division of the general operating or overhead charges referred to (that is, charges for service rendered more than one state) was based on, that is, in proportion to, the direct expenses in the respective states. The testimony also shows that this plan is universally adopted in making such an apportionment. The allocation is made monthly and the percentages vary from month to month, but at the end of the year the final figures are obtained and a statement made out each year of the whole expenses apportioned to each state. While the final figures are combined, nevertheless they contain the proper apportionment of the general overhead apportioned to each state. It is true that the plaintiff's witness stated that in the final statement made at the end of the year, he did not state the overhead and direct expense separately. But he also said: "We add the twelve months' figures together each month by itself; we added those figures and got a year's figures, which included the proper apportionment," and he had previously testified that the proper figures were used in the figures he gave for the division or apportionment of such expenses to South Carolina. This method had been the method of the company for a number of years. I see no objection to it. Indeed, the defendants have not shown that this is an incorrect method, nor have they suggested any other that should be followed. The matter is one in which the court must rely to a great extent upon the testimony of experts. The experts have said that it is a correct method and was the method actually adopted. I see no reason, therefore, for not adopting their conclusions in this respect.

[16] The defendants also criticize the result of the appraisal made by plaintiff of its property because of what is termed "unused investment," and claim that the present value shown by the evidence should be rejected for that reason. From the evidence it appears that in establishing its plant in various towns and cities the plaintiff planned for the future growth of such towns and cities and laid down therein equipment sufficient to provide for such growth. The defendants claim that the value of the additional equipment so provided for future use should not be included in the present value on which remuneration should be allowed, on the ground that it is idle capital. But such equipment is not idle capital in the proper sense of the term. A business concern, and especially a telephone company, must look to the future as well as the present. It is the part of wisdom to forecast the growth of communities they serve and be prepared to meet new conditions as they arise. It would be a very poor policy, and one that would entail tremendous expense in the long run, if a telephone company placed in a growing community conduits, lines, and other equipment barely sufficient for present demands, and then be forced after a few years, at enormous expense, to tear up the plant in order to place there the additional equipment necessary. Such a policy, instead of benefiting the public, would in the long run

entail heavier charges upon them and would deprive them, temporarily at least, of the additional facilities due to the delays necessary for the installation of the additional equipment required. Of course, proper business prudence also requires that additional equipment for future use, which must in a certain sense be unused for a period of time, should not be laid out, where such additional equipment can as readily be placed in the plant at the time it is needed. But the evidence in this case shows that the provision for future use was not of that character, but a proper provision such as would effect a large saving in the long run. Neither should public utilities be allowed in this respect to project their plans too far into the future, and thereby entail too heavy an expense upon present patrons for the benefit of others in a dim and distant future. But considering the nature of the plaintiff's business, I cannot find from the evidence that the time in the future for which plaintiff has planned and laid out its several properties is unreasonably distant, or that any of its expenditures in that behalf are unreasonable or beyond what a prudent business man would do under like circumstances.

[17] The defendants vigorously attacked the amount of depreciation to be deducted from the reproduction cost new in order to ascertain the present value as testified by the plaintiff's experts and found by the master. This attack is made on three grounds, viz.:

(1) Because depreciation was ascertained by physical examination of the property.

(2) Because defendants claim there were many errors made in that examination.

(3) Because the amount of "depreciation reserve" as shown by the books of the company is the true depreciation and should have been deducted.

As to the first ground, the testimony shows that the plaintiff caused an actual physical examination of its property to be made for the purpose of determining the depreciation. There are various methods employed by experts to determine depreciation. The defendants' expert apparently prefers what he terms "the straight line method." As the court understands it, in this method the main factors are the age of the plant and its probable life. The age is ascertained from the history and inspection, and the probable life from studies and inspection by experienced men. It is assumed that the depreciation is uniform and constant, and defendants' expert stated that it was used in those plants where the depreciation is uniform and constant. Having ascertained the age of the property and its probable life, a definite rule is obtained whereby to fix exactly the amount of depreciation at any particular time. Thus, as explained by the witness, if the property is five years old and its probable life is ten years, the depreciation is 50 per cent. It is obvious that this rule is highly theoretical and may in many cases lead to grossly erroneous results. This same witness also discusses the "curved line rule," which assumes that depreciation comes on very slowly at first, so far as percentage is concerned, but rapidly towards the end of the life of the property. This rule is more theoretical, if anything, than the "straight line method." These rules may be of some value where physical examination is impossible. Of course, there is no method of determining depreciation with exact mathematical precision. In physical examination the depreciation rests upon estimates and opinions of witnesses. But the theoretical methods mentioned rest not only upon estimate and opinion, but upon the correctness of a theory which is of doubtful correctness in many cases, and which we know cannot be correct in all cases. My own view is that certainly in a case of this kind the actual personal physical examination of the property by competent witnesses and their estimate and opinion of the actual depreciation is a better guide than any of the theoretical methods that have been suggested. The decisions practically sustain this conclusion. Pacific Gas & Electric Co. v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075; Landon v. Court of Industrial Relations of State of Kansas (D. C.) 269 F. 445; N. Y. Telephone Co. v. Prendergast (D. C.) 300 F. 825.

I may say that in passing upon the conflicting views of the experts on this and other matters in this case, I have borne in mind and applied the following pertinent observations of the Supreme Court in North Dakota v. Minnesota:

"It is difficult for a court to decide issues of fact upon which experts equal in number and standing differ flatly and when their conclusions rest on estimates upon the correctness of which the court, without technical knowledge, cannot undertake to pass. In such cases, the court looks about for outstanding facts from which the lay mind can safely draw inferences as to the probabilities. The court is also aided by its judgment of the care and accuracy with which the contrasted experts respectively have determined the data upon which they base their conclusions. The experts called by Minne-

sota in this case seemed to us to use more specific and accurately ascertained data for their estimates than those for North Dakota, and this circumstance, as well as the more satisfactory reasons given, lead us to think that their conclusions are more to be depended on." North Dakota v. Minnesota, 263 U. S. 365, 385, 386, 44 S. Ct. 138, 143 (68 L. Ed. 342).

As to the second ground, viz., that there are so many errors in the depreciation as shown by the appraisal as to destroy its value, both plaintiff and defendants had what is termed "spot checks," made to determine the correctness of the appraisal. In making these "spot checks," the person making it simply selected (arbitrarily and without designation by or knowledge on the part of the plaintiff or its officers or agents) certain limited portions of the property, made a physical examination of it, and estimated the value for the purpose of a comparison with the estimate of value placed upon the same portions of the property by the appraisers. The "spot check" made by plaintiff's witnesses tallied fairly well with the values fixed in the appraisal, and such differences as appeared were slight and no more than were to be expected in such cases. The "spot check" of the defendants discloses numerous apparent discrepancies in value, but these discrepancies were all either satisfactorily explained by the plaintiff's experts, or were of such a minor character as were naturally to be expected, and in no view could they be said to cast any real doubt upon the value of the appraisal.

[18] As to the third ground, viz., that the "depreciation reserve" as shown by the books should have been deducted from the reproduction cost new to ascertain present value, instead of the depreciation ascertained by the physical examination, the defendants contend that the "depreciation reserve" as shown on the books of the plaintiff should have been apportioned among states where the plaintiff operates, and the amount apportioned to South Carolina would be the true depreciation to be deducted. I cannot accede to this view. The "depreciation reserve fund" is merely a sum supposed to be set apart to take care of depreciation with a margin over. It is not as a matter of fact actually set aside, but is really simply entered on the books and is in fact a mere matter of bookkeeping. It does not represent actual depreciation, but only what observation and experience suggest as likely to happen, with a margin over. The law, however, requires actual depreciation to be deducted. See N. Y. Telephone

Co. v. Prendergast (D. C.) 300 F. 825. From the defendants' brief, however, it would appear that defendants' real ground is, not that the "depreciation reserve" should be used as the true depreciation, but that it should be used to impeach the accuracy of the depreciation ascertained by the physical examination. Assuming for the purposes of this case that such contention is correct, nevertheless, upon a careful consideration of the whole matter, I am satisfied that the depreciation ascertained by the actual physical examination of the plant is correct and represents the true depreciation of the property.

[19] The defendants attack the contract of the plaintiff with the American Telephone & Telegraph Company, whereby 4½ per cent. of the gross income of the plaintiff is paid as rental for certain apparatus, on the ground that it is a grossly unreasonable rental and should be either wholly or partly excluded from the operating expenses. They also attack the contract of the plaintiff with the Western Electric Company, for the purchase of supplies. The American Telephone & Telegraph Company owns all of the stock of the plaintiff and a large majority of the stock of the Western Electric Company. From the American Telephone & Telegraph Company the plaintiff leases its instruments and secures their maintenance and renewal. The contract provides for the rendering of various services by the American Telephone & Telegraph Company to the plaintiff. From the Western Electric Company, the plaintiff obtains a considerable portion of its equipment and supplies used in operating its local exchanges. The fact that the American Telephone & Telegraph Company owns the stock of the plaintiff and controls the Western Electric Company by stock ownership is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the community served by the plaintiff. Houston v. Southwestern Telephone Co., supra, 323 (42 S. Ct. 486). The court has scrutinized both of these contracts very carefully, and I have been unable to find, either from the contracts themselves, or from the evidence, that there is anything unreasonable in the contracts or in the manner of their performance. The testimony is overwhelming to the effect that both of the contracts are of great benefit to the plaintiff. Under its contract with the plaintiff, the American Telephone & Telegraph Company renders the plaintiff a large number of services which save it enormously in actual money and in other respects. As to the contract with the Western Electric Company, the proof is

overwhelming that the purchase of supplies through that company, when resorted to by the plaintiff, has been to the immense advantage of the plaintiff. Under that contract the plaintiff is not compelled to purchase from the Western Electric Company, but only does so when it is to its interest to do so. These contracts have been before the Supreme Court of the United States and other courts and have been uniformly upheld as reasonable, and I find nothing whatever in the facts of the case before me to differentiate it in this respect from the cases decided by the Supreme Court. Houston v. Southwestern Telephone Co., 259 U. S. 323, 42 S. Ct. 486, 66 L. Ed. 961; Southwestern Bell Telephone Co. v. Public Service Commission, supra; State v. Southwestern Telephone Co., 115 Kan. 236, 223 P. 771, 780, 781; City of Detroit v. Michigan, etc., 209 Mich. 395, 177 N. W. 306.

[20] One of the defendants' grounds as contained in the exceptions is that it was the duty and within the power of the plaintiff to offer evidence as to its capitalization or bond issue, and not having done so, the court should find against the plaintiff. As far as the court recalls, this point was not alluded to in the oral argument, and is barely mentioned in the printed brief. The plaintiff operates in five states, and its capitalization was as a whole, and its securities were not issued with reference to any particular state. No evidence was offered by either party as to the capitalization or bond issue or the proper apportionment of the same to South Carolina. Inasmuch as there was no evidence on the point, the master did not consider these items in arriving at present value, nor can this court. It is true that these items were stated in Smyth v. Ames and other cases to be proper subjects for consideration. But I do not understand that they are necessary subjects of consideration in all cases. If either party desired to offer testimony of the capitalization or bond issue, it might be taken into consideration for whatever it is worth in considering the case. It is a relevant fact as shown by the decisions, but it is not absolutely essential to a finding of present value. If the plaintiff thought that it would be of any value in determining the questions involved, it might have offered such evidence; but if the plaintiff took the view that it would not be of assistance and did not offer such evidence, then the defendants might have offered it. In most of the cases, as the court recalls them, the effort has been made on the part of utilities companies to have their stocks

and bonds taken as a controlling factor or a factor entitled to great weight, although it is well known that stocks and bonds of such corporations are frequently based upon fictitious values or, as it is commonly spoken of, "watered" stock. The courts have uniformly refused to consider stocks and bonds as controlling or that they have great weight, but have merely held that they are entitled to be considered. In San Diego Land Co. v. National City, supra, the Supreme Court used the following language: "The property may have cost more than it ought to have cost, and its outstanding bonds for money borrowed and which went into the plant may be in excess of the real value of the property. So that it cannot be said that the amount of such bonds should in every case control the question of rates, although it *may be*" (italics mine) "an element in the inquiry as to what is, all the circumstances considered, just both to the company and to the public." In Georgia Railway v. Railroad Commission, the Supreme Court, after quoting from Smyth v. Ames and Willcox v. Consolidated Gas Co. and stating the matters for consideration in such cases (including "the amount and market value of its bonds and stocks"), used the following language: "The rule laid down in these cases was expressly recognized as controlling, both by the Commission and by the lower court. Evidence bearing on *most of the facts*" (italics mine) "there declared to be relevant facts was before them." It is clear that in this last-mentioned case not all of the relevant matters stated in Smyth v. Ames were considered, and yet the Supreme Court in that case affirmed the ruling both of the Commission and of the lower court. I think it clear from the decisions that it is not absolutely essential that there be evidence before the court as to the capitalization or bond issue of the plaintiff for the court to be able to arrive at a conclusion of what is the present value of the property and whether the rates thereon are confiscatory.

[21] There was some suggestion in the oral argument to the effect that the master had based his conclusions as to the present value of the property upon reproduction cost new less depreciation alone or deemed that element controlling. The plaintiff in its brief deals with this question under the first exception, but I hardly think this exception covers that point, nor have I found any exception which appears to cover it. The defendants' brief makes no mention of the point at all, and I would be warranted therefore in deeming it abandoned; but in order

that there may be no misunderstanding as to the position of the court upon this matter, I will consider it briefly. Reproduction or replacement cost less depreciation is not a controlling factor in the ascertainment of present value. Ga. Ry. v. R. R. Com., supra, 630 (43 S. Ct. 680). It is one of the factors or relevant facts to be considered and given due weight in the ascertainment of present value. But this court does not base its conclusions upon this factor alone, nor deem it controlling, nor did the master, as a careful reading of his report will show. While the master in his report used this expression, "It would seem that the present value as determined by replacement less depreciation is probably the nearest and fairest system that can well be adopted to arrive at the present value of a public utility plant," yet in formulating his report, and after hearing all the evidence, he gave due consideration to every factor in evidence before him for the valuation of plaintiff's property in accordance with the decisions in Smyth v. Ames, supra, and the line of cases following that case, and in summing up, after a full discussion of the testimony, he used the following language:

"After a full consideration, therefore, of the original cost, the present cost of construction, the probable earning capacity of the property, the sum required to meet operating expenses, and other relevant matters needful to be regarded in formulating a sound judgment, I have reached the conclusion that, under the circumstances, the value of the property of the complainant, Southern Bell Telephone & Telegraph Company, in the state of South Carolina, is shown by the testimony adduced by it and heretofore discussed."

The master reached his conclusions, and I have reached mine, in finding the present value, upon due consideration of the original cost of construction, the amount expended in permanent improvements, the present as compared with the original cost of construction, the probable earning capacity under the rates prescribed by the statute, the sum required to meet operating expenses, and other relevant matters in aid of a reasonable judgment.

Upon due consideration of all the testimony and evidence in the cause, it is perfectly clear that the rates restored and prescribed by the act of the General Assembly are unreasonable and confiscatory, and, indeed, the present value of the property as ascertained by the master and found by this court might be largely reduced and still those rates, based upon such reduced value, would not provide anything like a proper remuneration under the Constitution. This may be easily shown by assuming various valuations much less than those found by this court and the master, and calculating the per cent. of profits the plaintiff would realize from the return such rates would produce; but it is unnecessary to set forth such calculations in detail, nor is it to be inferred from this suggestion that the court deems in any way that the valuation as found by the master and by the court should be in any respect reduced, but the suggestion is merely made for the purpose of showing how clear it is that the prescribed rates, in any possible view that could be taken of the value of the property, are unreasonable and confiscatory.

The defendants have argued and presented many objections and specifications in detail relating to the alleged insufficiency of the evidence to establish the plaintiff's claim; but they are all either fully met by what has been said, or they have been fully dealt with in the master's report, or are of such a minor nature as not to call for any further discussion.

[22] The only remaining question is the question of costs. The plaintiff necessarily must have been at an enormous expense in making the appraisal and bringing forward the evidence to make out its case. Ordinarily, in such case to impose the costs or any part thereof upon the plaintiff would be inequitable in view of the plain case that it has made. On the other hand, the defendants as public officers could hardly do less than endeavor to meet the issues and sustain the act of the General Assembly if possible. While the case made out by the plaintiff is plain, nevertheless at the outset the defendants could hardly have foreseen that it would be so plain as it is. It is of great benefit to the plaintiff to have the question settled, and it is likewise of benefit to the defendants and the public generally to have it settled. The issues are now determined, and the final decree will be entered so that the case may be presented to the Supreme Court for final decision. In these circumstances, I have deemed it but fair that the costs should be taxed and divided equally between the plaintiff and the defendants. This, it seems to me, would be equitable in this particular case.

It is therefore ordered, adjudged, and decreed:

(1) That the report of the special master and his conclusions and findings be and the same are hereby adopted, approved, ratified, and confirmed.

(2) That the rates restored and prescribed by the act of the General Assembly of

South Carolina, approved April 3, 1922, are unreasonable and confiscatory and do not afford the plaintiff fair remuneration upon its property, and the said act is therefore, so far as the plaintiff is concerned, unconstitutional, null, and void.

(3) That a writ of final injunction do issue from this court permanently and perpetually restraining and enjoining the defendants and each of them, and their successors in office, and all other persons for whom they stand or whom they represent, from enforcing the said act of the General Assembly of South Carolina, approved April 3, 1922, and from enforcing any penalties or other remedies that may be given against the plaintiff, its officers, agents, and employees, on account of its or their failure to observe, maintain, and collect the schedule of rates, or to furnish the free interchange communication prescribed by said act, and from attempting by any means whatsoever to interfere with or prevent the plaintiff, its officers, agents, and employees, from continuing in effect and operation the rates and charges approved by the orders of the Railroad Commission effective April 1, 1921, and from charging and collecting such rates and charges.

(4) That after the lapse of a reasonable time, if it should then appear that conditions and circumstances have so changed that the rates restored and prescribed by the said act of the General Assembly of South Carolina of April 3, 1922, are no longer unreasonable and confiscatory, but will then yield to the plaintiff reasonable compensation for the services aforesaid, the defendants may apply to this court, upon due notice to the plaintiff and upon proper showing, by bill or othwise, for a further order in that behalf. See Smyth v. Ames, 169 U. S. 466, 550, 18 S. Ct. 418, 42 L. Ed. 819; Houston v. Southwestern, etc., 259 U. S. 318, 321, 42 S. Ct. 486, 66 L. Ed. 961.

(5) That the costs including the compensation paid the special master be taxed by the clerk of this court, and that the plaintiff pay one-half thereof and the defendants pay one-half.

(6) That either party that may have advanced and paid more than its one-half of the costs, as herein provided, shall have the right, after the said costs have been taxed and apportioned one-half to each party as above ordered, to recover and enter judgment herein against the opposite party for the amount which such party has advanced in excess of its one-half of said costs as herein provided.